[Cite as *In re E.H.*, 2022-Ohio-1190.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| E.H., et al. | : | CASE NO. CA2021-11-012 |
| | : | O P I N I O N<br>4/8/2022 |
| | : | |
| | : | |
| | : | |

APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20213055, 20213056, and 20213057

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brinkman, Assistant Prosecuting Attorney, for appellee, Preble County Children Services

The Kollin Firm, llc, and Nathan D. Boone, for appellant, C.M.

Kirsten Knight, for appellee, T.H.

**HENDRICKSON, J.**

{¶1} Appellant ("Mother") appeals the decisions of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of her three children, Ev.H, El.H., and C.H., to appellee, Preble County Department of Jobs and Family Services ("PCDJFS" or "the Agency"). For the reasons outlined below, we affirm in part and reverse

in part the juvenile court's decisions, and remand the matter to the juvenile court for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶2} This case involves Mother's three children, Ev.H. born August 20, 2018, El.H. born August 7, 2019, and C.H. born January 10, 2021. The children's father ("Father") has separately appealed from the juvenile court's decisions.

{¶3} In May 2019, PCDJFS received a referral that Mother and Father were being arrested for domestic violence and that law enforcement requested a caseworker to respond and accept custody of Ev.H. Upon responding, the caseworker observed unsafe conditions for the child's age, including a heater set to a high degree placed on the floor next to piles of garbage and near the child. The caseworker also observed dirty diapers throughout the floor space, a nearly empty and open can of baby formula, and that the child's diaper was soaked through her clothing. The caseworker met with Mother and Father in the Preble County Jail shortly thereafter, at which point Mother and Father admitted to marijuana use and denied having jobs or income. As a result of these events, PCDJFS requested, and was granted, temporary custody of Ev.H. in juvenile court Case No. 20193025.

{¶4} On August 7, 2019, El.H. was born. At the time of his birth, PCDJFS did not request custody of the child, as the agency did not have any "current concerns for needing custody." Instead, PCDJFS requested protective supervision of El.H. in order to monitor Mother's care of him in the home. On September 26, 2019, Mother attended a visit with Ev.H. at the Agency. Because El.H. was not with Mother during the visit, PCDJFS requested Mother to submit to a drug screen, which she refused to do. At that point, a caseworker discovered a prescription vial of urine in Mother's bra. Upon questioning, Mother indicated the urine was "for somebody else." As a result of these events, the Agency

requested, and was granted, temporary custody of El.H. in juvenile court Case No. 20193063.

{¶5} The record reflects the Agency moved for permanent custody of Ev.H. and El.H. prior to C.H.'s birth, and an initial permanent custody hearing was held before the juvenile court in December of 2020.

{¶6} On January 10, 2021, PCDJFS received a referral that Mother gave birth to C.H. PCDJFS was then advised by a doctor that Mother tested positive for amphetamines and methamphetamines during her pregnancy in August and September. Thus, due to the child's exposure to the illegal substances and Mother's history of substance abuse, the Agency requested, and was granted, temporary custody of C.H. in juvenile court Case No. 20213001.

{¶7} On June 16, 2021, PCDJFS filed three new complaints with the juvenile court. According to the complaints, PCDJFS intended to dismiss the children's previous cases, i.e., Case Nos. 20193025, 20193063, and 20213001, because their dispositions were not held within 90 days. The new complaints alleged that all three children were dependent children and that Ev.H. was also an abused child. The new complaints were based on the events summarized above, and further alleged that Father was released from the MonDay Program in February 2021 and had tested positive for amphetamines on April 15, 2021.

{¶8} The new complaints sought permanent custody of the children as the juvenile court's original dispositional order. The request for permanent custody was based upon the Agency's allegation that neither Mother nor Father had remedied the concerns that led PCDJFS to remove the children and that PCDJFS continues to have concerns regarding the parents' substance use, domestic violence, income, and housing. Thus, when considering the totality of the circumstances, the Agency believed that a grant of permanent custody was required to ensure the health, welfare, and safety of the children.

{¶9} On June 24, 2021, the juvenile court held a temporary disposition hearing, where all parties agreed to temporary custody to the agency. The juvenile court then appointed a Court Appointed Special Advocate ("CASA") for the children. Although Mother and Father initially denied the allegations of the complaints, they subsequently entered pleas of "admit" and Ev.H., El.H., and C.H. were adjudicated dependent and Ev.H. was also adjudicated abused.

{¶10} By the time the permanent custody hearing was held on August 20, 2021, Ev.H. was placed in a kinship care with her half-sister's grandparents and El.H. and C.H. were placed together in foster care. At the time of the hearing, Ev.H. had been in her kinship care placement for almost two years and El.H. and C.H. had been in the same foster home since January 2021, when C.H. was less than one week old. The record indicates the children are doing well in their respective placements, are developmentally on track, and are bonded with their caretakers. Additionally, the record reflects that both sets of caretakers wish to adopt the children if permanent custody is awarded to the agency.

{¶11} A case plan was filed with the juvenile court. The case plan required Mother and Father to, among other requirements, submit to random drug screens, attend parenting classes, attend domestic violence classes, and complete drug, alcohol, and psychological assessments. The record indicates Mother and Father completed some of their case plan services, but struggled to consistently take or test negative during their drug screens. That is, both Mother and Father refused to provide a urine sample during the pendency of this case and tested positive for illegal substances on more than one occasion.

{¶12} At the permanent custody hearing, the juvenile court heard testimony from both Mother and Father, as well as S.M., EV.H.'s kinship placement, El.H. and C.H.'s foster father, the PCDJFS caseworker handling the case, and Mother's therapist. Following this hearing, the juvenile court issued a decision granting permanent custody of the children to

the Agency. In so holding, the juvenile court determined that, notwithstanding the reasonable efforts of PCDJFS, Mother and Father have failed continuously and repeatedly to substantially remedy the conditions which caused the children to be removed. The juvenile court also found that when considering the evidence, the reports, the exhibits, the record, and the pleadings, PCDJFS had proved by clear and convincing evidence that a grant of permanent custody was in the children's best interests.

## Appeal

{¶13} Mother now appeals the juvenile court's decision granting permanent custody. In support of her appeal, Mother raises the following assignments of error:

{¶14} Assignment of Error No. 1:

{¶15} THE PREBLE COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY IS IN THE MINOR CHILDREN'S BEST INTERESTS.

{¶16} Assignment of Error No. 2:

{¶17} THE PREBLE COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT APPELLANT HAD NOT REMEDIED THE CONDITION WHICH CAUSED THE REMOVAL OF THE CHILD FROM THE HOME.

## Permanent Custody Determination

{¶18} As an initial note, a public children services agency may seek permanent custody of a child in an abuse, neglect, or dependency proceeding in one of two ways. It may either request in the complaint that the juvenile court grant permanent custody as the original dispositional order or the agency may later seek permanent custody after an initial dispositional order granted that agency temporary custody. *In re T.K.K.*, 12th Dist. Butler No. CA2012-01-008, 2012-Ohio-3203, ¶ 22; *In re C.S.*, 12th Dist. Warren No. CA2018-07-

080, 2018-Ohio-4786, ¶ 21. In this case, PCDJFS sought permanent custody in its complaint as the original dispositional order, therefore the statutory provision of R.C. 2151.353(A)(4) applies. *In re W.R.,* 12th Dist. Fayette No. CA2011-08-016, 2012-Ohio-382, ¶ 30.

**{¶19}** Pursuant to R.C. 2151.353(A)(4), the juvenile court must satisfy a two-prong test to grant permanent custody in the original dispositional order. The juvenile court must: (1) determine that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent by considering the factors in R.C. 2151.414(E); and (2) determine that permanent custody is in the best interest of the child by considering the factors in R.C. 2151.414(D)(1). *In re A.A.*, 12th Dist. Clermont No. CA2015-12-098, 2016-Ohio-2992, ¶ 10. The public children services agency must prove by clear and convincing evidence that the statutory standards have been met before the court may award the agency permanent custody and terminate a natural parent's constitutionally protected liberty interest in the care and custody of the child. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).

**{¶20}** On review, an appellate court is generally limited to determining whether sufficient, credible evidence exists to support the decision to grant permanent custody. *In re W.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-Ohio-3051, ¶ 22. Nevertheless, an appellate court may review the judgment as to whether it is against the manifest weight of the evidence. *In re A.A.*, 2016-Ohio-2992 at ¶ 7, citing *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19. To determine whether the judgment is against the manifest weight of the evidence, an appellate court will weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a

manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re T.P.* at ¶ 19, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When an appellate court weighs the evidence, there exists a presumption in favor of the findings made by the finder of fact and any evidence prone to more than one construction will be construed to sustain the judgment. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

{¶21} As to the first prong, R.C. 2151.414(E) provides sixteen factors that a court may consider. If one or more of the factors exist, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" R.C. 2151.414(E). Therefore, the plain language of the statute only requires a finding of one R.C. 2151.414(E) factor to satisfy this part of the test.

{¶22} In this case, the juvenile court determined that R.C. 2151.414(E)(1) applies, as Mother and Father had not substantially remedied the conditions that led to the children's removal, and therefore the children could not, and should not, be placed with either parent within a reasonable period of time. In support of its finding, the juvenile court pointed to Mother and Father's illegal drug use and Father's alcohol abuse, which was related to each of the children's removal, as well as the removal of Mother's older child in 2016. The juvenile court noted the parents' recent positive tests in the months prior to the permanent custody hearing, as well as their extensive criminal histories involving illegal drugs. The juvenile court also determined that Mother and Father had failed to remedy the Agency's concerns regarding their finances and marginal living arrangements, which have existed since PCDJFS became involved with Ev.H. in 2018.

{¶23} On appeal, Mother argues the juvenile court erred in finding she had not substantially remedied the conditions that led to the children's removal from her care because she had completed a significant portion of her case plan. According to Mother,

the statute merely requires substantial remedy of the conditions, not absolute remedy, which she has accomplished.

{¶24} After our review of the record, there is sufficient, credible evidence to support the juvenile court's finding pursuant to R.C. 2151.414(E)(1). The record reflects that the children were initially removed due to domestic violence between Mother and Father, cleanliness and appropriateness of the home, and concerns regarding Mother and Father's income and substance abuse.

{¶25} At the hearing, the caseworker testified that although Mother and Father had "checked the boxes" of their case plan, the Agency remained concerned with Mother and Father's substance abuse, Father's alcohol abuse, and Mother's ability to parent and care for the children on a full-time basis with her ongoing mental health and substance abuse concerns.

{¶26} Regarding Mother's ongoing substance abuse, the caseworker testified that Mother refused to provide a urine sample on one occasion, which led to the removal of El.H., and also tested positive for methamphetamine and amphetamine the month prior to the hearing. After relapsing, Mother indicated that she began attending Narcotics Anonymous but was not involved in any formal treatment. The caseworker described Mother's continued substance abuse particularly concerning given Mother's history throughout this case and "past cases as well," during which Mother displayed an inconsistent ability to remain sober. The caseworker concluded that Mother's ability to appropriately care for the children while she is using is a concern for the Agency.

{¶27} The testimony at the hearing also revealed that while Mother engaged in mental health and substance abuse treatment at Recovery and Wellness, she was not truthful in her self-reporting, which affected her treatment and diagnoses. Mother's therapist testified that during her treatment at Recovery and Wellness, Mother was diagnosed with

opiate use and sustained remission and cannabis use disorder, adjustment disorder, major depressive disorder, and a posttraumatic stress disorder. Mother's diagnoses and treatment were based on her self-reporting, and the therapist relied upon Mother's truthful reporting of her history and symptoms. Thus, Mother's untruthful reporting impacted the treatment she received and the opinion of her therapist.

{¶28} According to Mother's therapist, Mother's mental health treatment was inconsistent, though she continued in substance abuse group treatment and graduated in November 2020. Mother was making progress in her treatment until her final appointment in June of 2021. At that point, Mother missed an appointment and "never got back on schedule" despite her therapist attempting to reengage Mother in service.

{¶29} Mother's therapist indicated that it would be up to Mother whether she wanted to continue her mental health services. Although a termination session did not occur in Mother's treatment, her therapist felt she was "in a good spot" as of June of 2021. However, the therapist indicated her opinion was related to Mother's mental health treatment, not her substance abuse treatment, and was based on Mother's self-report that she had been substance free since 2019. Mother's therapist did not have concerns regarding Mother's substance abuse, but acknowledged that if she learned that Mother had substance abuse related "needs" in August and September of 2020 and July of 2021, it would have been a concern for her. According to the Agency, continued sobriety is necessary to truly resolve concerns with substance abuse.

{¶30} When considering the above, we find the record clearly and convincingly supports the juvenile court's determination that Mother was unable to substantially remedy the Agency's concern regarding her substance abuse. As the juvenile court noted, and the caseworker testified at the hearing, the parents' substance abuse was related to the removal of all three children, and was the primary concern connected to El.H. and C.H.'s

removal. As such, it was imperative for Mother to remedy the Agency's concerns in this regard. This is because, and as acknowledged by both Mother and Father at the hearing, substance abuse can affect one's ability to parent his or her children.

{¶31} Despite the importance of alleviating the agency's concerns regarding their substance abuse, the record indicates both parents failed to prioritize their sobriety or treatment throughout the case. For example, both parents were inconsistent in their treatment and attempted to deceive the agency with fraudulent urine samples on separate occasions, and both failed to successfully reengage in services after relapsing shortly before the permanent custody hearing.

{¶32} The record also reflects that Mother's ability to parent the children while struggling with her ongoing substance abuse and mental health issues remained concerning to the Agency. On appeal, Mother claims she was never given an opportunity to demonstrate her ability to parent the children for extended periods of time, as the Agency never expanded her visitation, and therefore, the Agency's concerns in this regard should not weigh against her. After our review, we disagree with Mother's claims. Although Mother consistently visited with the children at the Agency, those visits were described as a "roller coaster," and would either go "really well" or Mother would be mentally "off" and "not there." Additionally, despite Mother's ability to provide for the children's needs during those visits, the caseworker remained concerned that Mother's drug use and mental health concerns impacted her ability to properly care for three children under the age of three "for longer than an hour." According to the caseworker, having the children for more than an hour during supervised visits would be a "huge adjustment" for Mother.

{¶33} While Mother is correct that the Agency did not expand her visitation, the record indicates that expanded visitation was not available to Mother due to her "inconsistency" and in light of her positive drug screens. As such, PCDJFS's concerns

regarding Mother's ability to care for and parent the children on a full-time basis are valid.

{¶34} Additionally, although there was evidence that Mother and Father had completed their case plan requirements, "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is simply a means to a goal, but not the goal itself." *In re A.R.*, 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18. Accordingly, although Mother did "check the boxes" and complete most of her case plan services, it is evident Mother had not remedied the primary concern that led to the children's removal. This was reiterated at the permanent custody hearing, as the caseworker testified that it is possible for the Agency to have lingering concerns that prevent reunification despite the parents' completion of all case plan objectives.

{¶35} Consequently, it is apparent from the record that there was sufficient evidence to satisfy the first prong of the R.C. 2151.353(A)(4) test. As such, Mother's second assignment of error is overruled.

{¶36} Turning to the second prong of the test, the juvenile court determined that it was in the best interests of the children to grant PCDJFS permanent custody. Pursuant to R.C. 2151.414(D)(1), a juvenile court shall consider, but is not limited to, the following five factors to determine a child's best interests:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the

maturity of the child;

(c) The custodial history of the child * * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶37} The Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, Slip Opinion 2020-Ohio-5102, ¶ 31. However, a court reviewing such a decision "must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *Id.* While the statute does not define "consider," the Ohio Supreme Court interprets "consider" as meaning "to reflect on: think about with a degree of care or caution." *Id.* at ¶ 25.

{¶38} In making its best interest determination, the juvenile court relied upon its "findings of fact, the evidence, the reports, the exhibits, the record, the pleadings and the reports of CASA." In its decision, the juvenile court determined it was in the best interests of the children for the agency to have permanent custody because the children are doing well and have all their needs met in their respective foster/kinship homes and that the children are very bonded to their foster/kinship families. The juvenile court also found that the children are bonded to each other and that granting permanent custody to the Agency will allow Ev.H. to visit with C.H. and El.H. and will allow the younger children to remain together. The juvenile court further found that the children need stability and permanency that only permanent custody could provide, and that no other relative could be considered as custodians for the children.

**{¶39}** In light of these findings, the juvenile court expressly considered the enumerated factors of R.C. 2151.414(D)(1)(a) and (d). When considering the record and the juvenile court's findings of fact, it is also clear that the juvenile court considered R.C. 2151.414(D)(1)(c) and (e). However, neither the juvenile court's entry, nor the testimony at the permanent custody hearing, provides any insight into the juvenile court's consideration of R.C. 2151.414(D)(1)(b), which requires the juvenile court to consider the children's wishes "as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity."

**{¶40}** Other districts have held that a juvenile court commits reversible error in granting permanent custody of a child to a public children services agency where the record did not contain reliable evidence about the child's wishes. See *In re Swisher*, 10th Dist. Franklin Nos. 02AP-1408 and 02AP-1409, 2003-Ohio-5446, ¶ 40; *In re Miller*, 5th Dist. Licking No. 04 CA 32, 2005-Ohio-856, ¶ 38-41; *In re Ridenour*, 11th Dist. Lake Nos. 2003-L-146 thru 2003-L-148, 2004-Ohio-1958, ¶ 46-48; *In re Staten*, 2d Dist. Montgomery No. CA17146, 1998 Ohio App. LEXIS 4959, 10-11 (Oct. 23, 1998). In this case, there is no evidence in our record, let alone "reliable evidence," regarding the children's wishes. That is, our record is devoid of any testimony or information related to the children's wishes or their inability to express those wishes due to their young ages.

**{¶41}** This is true even when considering the information provided to the juvenile court by the appointed CASA, who did not testify at the permanent custody hearing and did not file her final report and recommendation with the juvenile court. Interestingly, despite repeated references at the hearing and in the juvenile court's entry to "CASA reports" and her recommendation, we have no evidence in our record as to whether CASA believed granting permanent custody to PCDJFS is in the children's best interests. Rather, the single CASA report included in our record was filed on November 10, 2021, after the permanent

custody hearing, and only references Ev.H. and her progress in her kinship placement. Although the record suggests additional CASA reports were prepared prior to the hearing, and we have attempted to obtain those reports from the juvenile court, such reports were not provided to this court on appeal. Consequently, we have no evidence in our record as to what the CASA recommendation was or what information her missing reports include. Without viewing these reports, we decline to assume that they reference the children's wishes or their inability to express those wishes due to their ages. See *State v. Shaibi*, 12th Dist. Warren No. CA2020-07-038, 2021-Ohio-1352, fn. 4.

{¶42} Accordingly, based upon the record before us, we cannot discern from the juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factor of R.C. 2151.414(D)(1)(b).

{¶43} Given the lack of any evidence concerning the children's wishes or a CASA report regarding the same, we reverse the decision of the juvenile court and remand this matter to the juvenile court. Upon remand, the juvenile court is instructed to consider the children's wishes as expressed by the children themselves or through the CASA and render a new decision regarding the children's best interests. The juvenile court shall also instruct the CASA to file her reports with the juvenile court. If the CASA reports do not reference the children's wishes or their inability to express those wishes due to their ages, the CASA shall meet with the children and prepare a new CASA report reflecting her findings regarding the children's wishes and their level of maturity. If the parties have not previously reviewed the newly filed CASA reports, or in the event a new report is prepared, the juvenile court shall conduct a hearing on the sole issue of the children's wishes and render a new decision regarding the children's best interests.

{¶44} In light of the foregoing, we sustain Mother's first assignment of error. The juvenile court's judgment is therefore affirmed in part, reversed in part, and remanded for

further proceedings consistent with this opinion.

{¶45} Judgment affirmed in part and reversed in part.

BYRNE, J., concurs.

PIPER, P.J., concurs separately.

**PIPER, P.J., concurring separately.**

{¶46} I completely concur in the judgment of my colleagues, however, I write separately to express the significance of the recent Ohio supreme court case *In re: A.M.*, Slip Opinion 2020-Ohio-5102.

{¶47} The juvenile court in that case listed generically the five factors which must be considered in R.C. 2151.141(D)(1). The supreme court noted there was no application of the factors to specific facts of the case and therefore generically listing the factors was insufficient. While the supreme court noted that each factor does not have to be individually discussed, it must nevertheless be obvious from the juvenile court's decision that it did consider *each* factor. In other words, the juvenile court's discussion or analysis in its decision or entry must be sufficient to conclude the juvenile court actually reflected upon the individual factors. In reviewing the juvenile court's decision, the supreme court determined "obviously" *each* factor was considered.

{¶48} I write separately because our foregoing opinion may give the impression that just having information in the record, or in a report, may satisfy the juvenile court's affirmative duty to "consider" or "reflect upon with a degree of care or caution" each factor. However, a careful reading will not find that *In re: A.M.* suggests merely having the information buried in the record or testimony which might go to a factor, is sufficient to demonstrate the juvenile court "considered" or "reflected upon" that information or testimony with a degree of care or caution.

**{¶49}** The supreme court went out of its way to explain the need for building public trust and confidence in these extremely important cases dealing with children and the parental right to raise one's child. *In re A.M.* discusses in detail the "best practices" and "strongly encourages" juvenile courts to give some basis or articulation, at least to some degree, as to each factor. Support for each factor's consideration leads to an understandable conclusion. The supreme court also noted that knowing what the juvenile court considered is fundamental for meaningful appellate review.

**{¶50}** *In re: A.M.* represents more than any one isolated paragraph or sentence, as it is highlighted with rationale and reasoning aimed at elevating judicial accountability as well as public understanding. Both the majority and dissenting opinions are essential reading for all involved in permanent custody proceedings.