[Cite as *In re E.H.*, 2022-Ohio-1275.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

IN RE: : 

    E.H., et al. :     CASE NO. CA2021-11-015

:     O P I N I O N
    4/18/2022

:

:

:

APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20213055, 20213056, & 20213057

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brinkman, Assistant Prosecuting Attorney, for appellee, Preble County Children Services.

David J. Fierst, for appellant, T.H.

The Kollin Firm, llc, and Nathan D. Boone, for appellee, C.M.

    **PIPER, P.J.**

    {¶ 1} Appellant ("Father") appeals the decisions of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of his children to appellee, Preble County Department of Jobs and Family Services ("PCDJFS" or "the Agency"). For the reasons outlined below, we affirm in part and reverse in part the juvenile court's decisions, and remand the matter for further proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 2} This case involves Father's three children, Ev.H. born August 20, 2018, El.H. born August 7, 2019, and C.H. born January 10, 2021. The children's mother ("Mother") has separately appealed from the juvenile court's decisions. *See In re E.H.*, Preble CA2021-11-012, 2022-Ohio-1190.

{¶ 3} In May 2019, PCDJFS received a referral that Mother and Father were being arrested for domestic violence and that law enforcement requested a caseworker to respond and accept custody of Ev.H. Upon responding, the caseworker observed unsafe conditions for the child's age, including a heater set to a high degree placed on the floor next to piles of garbage and near the child. The caseworker also observed dirty diapers throughout the floor space, a nearly empty and open can of baby formula, and that the child's diaper was soaked through her clothing. The caseworker met with Mother and Father in the Preble County Jail shortly thereafter, at which point Mother and Father admitted to marijuana use and denied having jobs or income. As a result of these events, PCDJFS requested, and was granted, temporary custody of Ev.H. in juvenile court Case No. 20193025.

{¶ 4} On August 7, 2019, El.H. was born. At the time of his birth, PCDJFS did not request custody of the child. Instead, PCDJFS requested protective supervision of El.H. in order to monitor Mother's care of him in the home. On September 26, 2019, Mother attended a visit with Ev.H. at the Agency. During the visit, Mother refused to submit to a drug screen. At that point, a caseworker discovered a prescription vial of urine in Mother's bra, which Mother claimed was for "somebody else." As a result of these events, the Agency requested, and was granted, temporary custody of El.H. in juvenile court Case No. 20193063.

{¶ 5} At some point between June 2020 and August 2020 Father was sentenced

on charges related to unpaid child support, as well as a probation violation for missing a meeting with his probation officer and possessing unprescribed pain medication. As part of his sentence, Father elected to attend the MonDay Program in lieu of a prison term. Father successfully completed the program and was released in February 2021.

{¶ 6} Some time prior to January 2021, the Agency moved for permanent custody of Ev.H. and El.H., and an initial permanent custody hearing was held before the juvenile court in December 2020.

{¶ 7} On January 10, 2021, PCDJFS received a referral that Mother gave birth to C.H. and was advised by a doctor that Mother tested positive for amphetamines and methamphetamines during her pregnancy in August and September. Thus, due to the child's exposure to the illegal substances and Mother's history of substance abuse, the Agency requested, and was granted, temporary custody of C.H. in juvenile court Case No. 20213001.

{¶ 8} On June 16, 2021, PCDJFS filed three new complaints with the juvenile court. According to the complaints, PCDJFS intended to dismiss the children's previous cases, i.e., Case Nos. 20193025, 20193063, and 20213001, because their dispositions were not held within 90 days. The new complaints alleged that all three children were dependent children and that Ev.H. was also an abused child. The new complaints were based on the events summarized above, and further alleged that Father was released from the MonDay Program in February 2021 and had tested positive for amphetamines on April 15, 2021.

{¶ 9} The new complaints sought permanent custody of the children as the juvenile court's original dispositional order. The request for permanent custody was based upon the Agency's allegation that neither Mother nor Father had remedied the concerns that led PCDJFS to remove the children and that PCDJFS continues to have concerns regarding the parents' substance use, domestic violence, income, and housing. Thus, when

considering the totality of the circumstances, the Agency believed that a grant of permanent custody was required to ensure the health, welfare, and safety of the children.

{¶ 10} On June 24, 2021, the juvenile court held a temporary disposition hearing, where all parties agreed to temporary custody to the agency.  The juvenile court then appointed a Court Appointed Special Advocate ("CASA") for the children.  Although Mother and Father initially denied the allegations of the complaints, they subsequently entered pleas of "admit" and Ev.H., El.H., and C.H. were adjudicated dependent and Ev.H. was also adjudicated abused.

{¶ 11} A case plan was filed with the juvenile court.  The case plan required Mother and Father to, among other requirements, submit to random drug screens, attend parenting classes, attend domestic violence classes, and complete drug, alcohol, and psychological assessments.  Father was also required to complete a mental health evaluation.

{¶ 12} The record indicates that while at the MonDay program, Father completed most of his case plan services, including parenting classes, an anger management course, drug and alcohol treatment, and the mental health and substance abuse evaluations. Despite this progress, Father struggled to consistently take or test negative during his drug screens.

{¶ 13} On August 20, 2021, the juvenile court held a permanent custody hearing.  At the time of the hearing, Ev.H. was placed in a kinship care with her half-sister's maternal grandparents and El.H. and C.H. were placed together in foster care.  At that point, Ev.H. had been in her kinship care placement for almost two years and El.H. and C.H. had been in the same foster home since January 2021, when C.H. was less than one week old. The record indicates the children are doing well in their respective placements, are developmentally on track, and are bonded with their caretakers.  Additionally, the record reflects that both sets of caretakers wish to adopt the children if permanent custody is

awarded to the agency.

{¶ 14} At the permanent custody hearing, the juvenile court heard testimony from both Mother and Father, as well as S.M., EV.H.'s kinship placement, El.H. and C.H.'s foster father, the PCDJFS caseworker handling the case, and Mother's therapist. Following this hearing, the juvenile court issued a decision granting permanent custody of the children to the agency. In so holding, the juvenile court determined that, notwithstanding the reasonable efforts of PCDJFS, Mother and Father have failed continuously and repeatedly to substantially remedy the conditions which caused the children to be removed. The juvenile court also found that when considering the evidence, the reports, the exhibits, the record, and the pleadings, PCDJFS had proved by clear and convincing evidence that a grant of permanent custody was in the children's best interests.

## Appeal

{¶ 15} Father now appeals the juvenile court's decision granting permanent custody. In support of his appeal, Father raises two assignments of error for our review:

{¶ 16} Assignment of Error No. 1:

{¶ 17} THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING PERMANENT CUSTODY TO THE AGENCY BASED ON MULTIPLE ALLEGATIONS IN COMPLAINTS THAT WERE NO LONGER CURRENT.

{¶ 18} Assignment of Error No. 2:

{¶ 19} IN GRANTING THE AGENCY PERMANENT CUSTODY OF ALL THREE * * * CHILDREN WHEN THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THAT DECISION INDICATES (sic) THE TRIAL COURT LOST ITS WAY.

## Standard of Review

{¶ 20} A public children services agency may seek permanent custody of a child in an abuse, neglect, or dependency proceeding in one of two ways. It may either request in

the complaint that the juvenile court grant permanent custody as the original dispositional order or the agency may later seek permanent custody after an initial dispositional order granted that agency temporary custody. *In re T.K.K.*, 12th Dist. Butler No. CA2012-01-008, 2012-Ohio-3203, ¶ 22; *In re C.S.*, 12th Dist. Warren No. CA2018-07-080, 2018-Ohio-4786, ¶ 21. In this case, PCDJFS sought permanent custody in its complaint as the original dispositional order, therefore the statutory provision of R.C. 2151.353(A)(4) applies. *In re W.R.*, 12th Dist. Fayette No. CA2011-08-016, 2012-Ohio-382, ¶ 30.

{¶ 21} Pursuant to R.C. 2151.353(A)(4), the juvenile court must satisfy a two-prong test to grant permanent custody in the original dispositional order. The juvenile court must: (1) determine that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent by considering the factors in R.C. 2151.414(E); and (2) determine that permanent custody is in the best interest of the child by considering the factors in R.C. 2151.414(D)(1). *In re A.A.*, 12th Dist. Clermont No. CA2015-12-098, 2016-Ohio-2992, ¶ 10. The public children services agency must prove by clear and convincing evidence that the statutory standards have been met before the court may award that agency permanent custody and terminate a natural parent's constitutionally protected liberty interest in the care and custody of the child. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).

{¶ 22} On review, an appellate court is generally limited to determining whether sufficient, credible evidence exists to support the decision to grant permanent custody. *In re W.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-Ohio-3051, ¶ 22. Nevertheless, an appellate court may review the judgment as to whether it is against the manifest weight of the evidence. *In re A.A.*, 2016-Ohio-2992 at ¶ 7, citing *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19. To determine whether the judgment is against the

manifest weight of the evidence, an appellate court will weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re T.P.* at ¶ 19, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When an appellate court weighs the evidence, there exists a presumption in favor of the findings made by the finder of fact and any evidence prone to more than one construction will be construed to sustain the judgment. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

**Permanent Custody Complaints**

{¶ 23} In his first assignment of error, Father argues that the permanent custody complaints were based upon outdated and unproven allegations. Father specifically takes issue with the complaints' allegations concerning domestic violence and the cleanliness of the parents' home. According to Father, because these issues were not addressed in the testimony provided at the permanent custody hearing, the juvenile court erred in granting permanent custody to the agency.

{¶ 24} In support of his argument, Father cites to a recent decision from the First District Court of Appeals. See *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273. In that case, the court held that granting permanent custody of a child to a children's services agency was erroneous where the record did not support that the mother had failed to remedy the problems that caused the child's removal from her care. *Id.* at ¶ 43. In so holding, the court noted that the agency submitted evidence that was "outdated and unconnected" to the reasons the child was initially removed, and that the agency failed to present any evidence that the concerns which prompted the child's removal still existed when the agency moved for permanent custody of the child. *Id.* at ¶ 42. The court

concluded that, due to the lack of recent evidence to support the agency's allegations, the agency failed to prove the mother had not substantially remedied the Agency's original concerns, and failed to satisfy the first prong of R.C. 2151.414(B)(1). *Id.* at ¶ 46.

{¶ 25} After a review of the record, our case is clearly distinguishable from *In re D.M.* Here, PCDJFS requested permanent custody of the children in June 2021, and a permanent custody hearing was held in August 2021, just two months later. The complaints provided background information regarding each child's removal from the parents' care, and also provided allegations relating to events occurring in January, February, and April 2021.

{¶ 26} The evidence produced at the hearing related to Mother and Father's current progress in their case plans, as well as the Agency's ongoing concerns with Mother and Father. Although Father is correct that no evidence was presented regarding the Agency's initial concerns of domestic violence, the caseworker did not identify domestic violence in the home as a current concern for the Agency. Rather, the Agency indicated the primary concern preventing Mother and Father from reunifying with the children was their continued drug use and Mother's ability to parent while using. These concerns existed at the time of each child's removal and were identified in each of the permanent custody complaints. As such, the bulk of the testimony at the hearing related to their drug abuse treatment and attempted sobriety, including evidence that Mother and Father relapsed shortly before the hearing, declined to take drug tests in the months preceding the hearing, and remained unable to successfully complete drug treatment and remain sober while working on their case plan services.

{¶ 27} When considering the testimony provided at the hearing in conjunction with the allegations of the complaints, we find the Agency presented significant recent and relevant evidence of PDCJFS's present concerns.

{¶ 28} Accordingly, we overrule Father's first assignment of error.

**Permanent Custody Determination**

{¶ 29} In his second assignment of error, Father argues the juvenile court's decisions granting permanent custody of the children to the Agency is against the manifest weight of the evidence.

{¶ 30} As to the first prong of the permanent custody test, R.C. 2151.414(E) provides sixteen factors that a court may consider. If one or more of the factors exist, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" R.C. 2151.414(E). Therefore, the plain language of the statute only requires a finding of one R.C. 2151.414(E) factor to satisfy this part of the test.

{¶ 31} In this case, the juvenile court determined that R.C. 2151.414(E)(1) applies, as Mother and Father had not substantially remedied the conditions that led to the children's removal, and therefore the children could not, and should not, be placed with either parent within a reasonable period of time. In support of its finding, the juvenile court pointed to Mother and Father's illegal drug use and Father's alcohol abuse, which was related to each child's removal. The juvenile court noted the parents' recent positive tests in the months prior to the permanent custody hearing, as well as their extensive criminal histories involving illegal drugs. The juvenile court also determined that Mother and Father had failed to remedy the Agency's concerns regarding their finances and marginal living arrangements, which have existed since PCDJFS became involved with Ev.H. in 2019.

{¶ 32} On appeal, Father argues that he and Mother had substantially remedied the conditions that led to the children's removal from their care because they had completed their case plans. Thus, in light of their case plan progress, Father claims the Agency failed to prove by clear and convincing evidence that the statutory factors were met.

{¶ 33} At the hearing, the caseworker testified that despite the progress in his case

plan, the Agency remained concerned with Father's drug and alcohol use, as well as his failure to follow through with his treatment. Throughout the case, Father failed to consistently test negative or submit to random drug screens when requested by the Agency. Although Father testified he was clean from the beginning of this case until April of 2021, the record indicates he was on probation and in the MonDay program for most of that time, and began testing positive less than two months after his release from the program.

{¶ 34} Most recently, in July 2021, Father indicated he could not provide a urine sample because he was unable to use the restroom. In May 2021, Father "relapsed" on methamphetamine. On another occasion, in April 2021, Father tested positive for amphetamines. Regarding this positive screen, Father admitted to drinking alcohol, but adamantly denied using amphetamines. Father testified he used someone else's urine during the test, because he knew he would test positive for alcohol, and it was the fraudulent urine that tested positive for amphetamines. On other occasions, Father tested positive for alcohol, though he denied he was drinking alcohol and stated he used someone else's urine for those tests as well.

{¶ 35} Additionally, although Father completed the assessments in accordance with the case plan, he did not follow through with his outpatient treatment through Recovery and Wellness. According to the caseworker, Father had a history of engaging in substance abuse treatment for a short period of time and would then cease any engagement. At one point, Father was discharged from substance abuse treatment due to noncompliance. This pattern of inconsistent participation in treatment continued after Father's relapse in May 2021, although he reengaged in treatment in the weeks prior to the hearing. Despite his reengagement, Father had not completed substance abuse treatment by the time of the hearing.

{¶ 36} The testimony provided at the hearing indicates the caseworker was not the

only person concerned about Father's substance and alcohol abuse, and the effect such use has on his ability to parent his children. Specifically, S.H., who is Ev.H.'s kinship placement, explained that although she did not have any "concerns" about Father's interaction with Ev.H. during their visits, she "worried" about his drinking. Mother also testified that she is "sure" that Father's drug use affects his ability to parent the children, and that, although she believes Father will remain sober for the children, she would ultimately do what was best for her children with regards to Father.

{¶ 37} Father also admitted that his drug use affects his ability to parent the children, and acknowledged that, up until the hearing, he had not put his recovery first. As evidence of his recent desire to maintain sobriety, Father testified he applied for Sober Living, which is an inpatient treatment facility, the day prior to the permanent custody hearing. Although Father was unsure if there was an interview process and was unclear on the details for admission and the program itself, Father believed there was an open spot for him at Sober Living and that he would be accepted.

{¶ 38} According to Father, he applied for Sober Living because his substance abuse treatment oftentimes conflicted with his job, which causes inconsistencies in his attendance. Father "wanted to show [his] dedication as far as, you know, like * * * doing it for real[.]" Father explained that, after his previous relapse, "[he] knew that [he] couldn't let * * *[his] guard down anymore," and that he needed to put his recovery first. Father indicated his reference to "relapse" was when he used methamphetamine in May 2021.

{¶ 39} In light of the above, and after our review of the entire record, we find there is sufficient, credible evidence to support the juvenile court's finding pursuant to R.C. 2151.414(E)(1). That is, the record clearly and convincingly supports the juvenile court's determination that Father was unable to substantially remedy the Agency's concern regarding his substance abuse. As noted by the caseworker at the hearing, and evidenced

by the permanent custody complaints, the parents' substance abuse was related to the removal of all three children, and was the primary concern connected to El.H. and C.H.'s removal.

{¶ 40} Given the role that the parents' substance abuse had in the children's removal, it was essential for Father to remedy the Agency's concerns in this regard. Despite the importance of remedying the Agency's concerns regarding his substance abuse, Father admittedly failed to prioritize his sobriety or treatment throughout the case. This includes a history of being inconsistent in his drug treatment and attempting to deceive the Agency with fraudulent urine samples on more than one occasion.

{¶ 41} While Father argues he has completed his case plan services, it is well settled that "the completion of case plan services alone does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶ 42} Additionally, and while there is evidence that Father made some progress towards his case plan goals, primarily while he was in the MonDay program, the record indicates he has completely failed to address the substance abuse issues that led to the children's removal from his care. Although Father applied to Sober Living shortly before the hearing, his attempt to demonstrate a commitment to his sobriety and recovery was too little too late in this case. That is, due to his last-minute application to Sober Living, Father had not been accepted at the time of the hearing and was unable to demonstrate any long-

term success from the program.

{¶ 43} A juvenile court "is not required to deny [a] permanent custody motion simply based upon the groundless speculation that the [father] might successfully complete [his] drug treatment, * * * and remain drug-free." *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, citing *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50. "[A] parent is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *Id.* As such, although Father has taken a small step toward recovery, there is no evidence in the record that he has substantially remedied his substance abuse problem.

{¶ 44} Consequently, it is apparent from the record that the juvenile court's decision regarding the first prong of the R.C. 2151.353(A)(4) test is supported by sufficient credible evidence and is not against the manifest weight of the evidence.

{¶ 45} Turning to the second prong of the test, the juvenile court determined that it was in the best interests of the children to grant PCDJFS permanent custody. Pursuant to R.C. 2151.414(D)(1), a juvenile court shall consider, but is not limited to, the following five factors to determine a child's best interests:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 46}** Recently, the Ohio Supreme Court provided guidance as to what is required of a juvenile court when "considering" the enumerated factors of R.C. 2151.414(D)(1)(a)-(e). *In re A.M.*, Slip Opinion 2020-Ohio-5102, ¶ 23-32. In that case, the juvenile court listed generically the five factors which must be considered in R.C. 2151.141(D)(1), but did not apply the factors to any specific facts of the case. *Id.* at ¶ 34. The Ohio Supreme Court held that although R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor or to include a written discussion of each of those factors in its decision or judgment entry, "a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *Id.* at ¶ 31. While the statute does not define "consider," the Ohio Supreme Court noted that the common, everyday meaning of "consider" is "to reflect on: think about with a degree of care or caution." *Id.* at ¶ 25.

**{¶ 47}** The Ohio Supreme Court held that the juvenile court met its burden to consider the required factors when it "obviously" considered the factors within R.C. 2151.414(D)(1)(a)-(d) in its judgment entry, and acknowledged R.C. 2151.414(D)(1)(e) as a consideration in its best interest analysis. The court concluded in affirming the grant of permanent custody "because the record demonstrates" the statutory factors were considered by the juvenile court.[1] *Id.* at ¶ 42.

**{¶ 48}** Here, like in *In re A.M.*, the juvenile court generically referenced the five factors that must be considered pursuant to R.C. 2151.141(D)(1). However, unlike *In re A.M.*, the juvenile court did not state a reliance upon or consideration of the statutory factors when making its best interest determination. Rather, the juvenile court indicated it relied

---

1. "Demonstrates" means to prove or make clear by reasoning or evidence. *Webster's Ninth New Collegiate Dictionary* 338 (1983).

upon its "findings of fact, the evidence, the reports, the exhibits, the record, the pleadings and the reports of CASA."

{¶ 49} In its decision, the juvenile court determined it was in the best interests of the children for the agency to have permanent custody because the children are doing well and have all their needs met in their respective foster/kinship homes and that the children are very bonded to their foster/kinship families. The juvenile court also found that the children are bonded to each other and that granting permanent custody to the Agency will allow Ev.H. to visit with C.H. and El.H. and will allow the younger children to remain together. The juvenile court further found that the children need stability and permanency that only permanent custody could provide, and that no other relative could be considered as custodians for the children.

{¶ 50} In light of these findings, the juvenile court obviously considered the enumerated factors of R.C. 2151.414(D)(1)(a) and (d). When considering the record and the juvenile court's findings of fact, it is also clear that the juvenile court considered R.C. 2151.414(D)(1)(c) and (e). However, neither the juvenile court's entry, nor the record, demonstrates any consideration of R.C. 2151.414(D)(1)(b) by the juvenile court.

{¶ 51} R.C. 2151.414(D)(1)(b) requires the juvenile court to consider the children's wishes "as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity." In this case, the juvenile court appointed a CASA, however, she did not testify at the permanent custody hearing and did not file her final report and recommendation with the juvenile court.[2] Despite repeated references at the hearing and in the juvenile court's entry to "CASA reports" and her recommendation, we have no

---

2. We note that, pursuant to R.C. 2151.414(C), a written report of the guardian ad litem, or CASA, "shall be submitted to the court prior to or at the time of the [permanent custody] hearing[.]" Thus, the CASA's failure to file any written report with the juvenile court is a direct violation of the statutory responsibility to file such a report.

evidence in our record as to whether CASA believed granting permanent custody to PCDJFS is in the children's best interests. Rather, the single CASA report included in our record was filed after the permanent custody hearing, and only references Ev.H. and her progress in her kinship placement.[3]

{¶ 52} Although the record suggests additional CASA reports were prepared prior to the hearing, and were reviewed and considered by the juvenile court in making its decision, we have been unsuccessful, despite separate requests, in obtaining those additional reports on appeal.[4] Consequently, we have no evidence in our record as to what the CASA recommendation was or what information her missing reports include. Thus, although the juvenile court considered the missing reports before rendering its best interest determination, we cannot assume that the consideration of those reports satisfied the juvenile court's duty to consider R.C. 2151.414(D)(1)(b) as mandated by *In re A.M.*

{¶ 53} Other districts have held that a juvenile court commits reversible error in granting permanent custody of a child to a public children services agency where the record did not contain reliable evidence about the child's wishes. See *In re Swisher*, 10th Dist. Franklin Nos. 02AP-1408, 02AP-1409, 2003-Ohio-5446, ¶ 40; *In re Miller*, 5th Dist. Licking No. 04 CA 32, 2005-Ohio-856, ¶ 38-41; *In re Ridenour*, 11th Dist. Lake Nos. 2003-L-146 thru 2003-L-148, 2004-Ohio-1958, ¶ 46-48; *In re Staten*, 2d Dist. Montgomery No. CA17146, 1998 Ohio App. LEXIS 4959, 10-11 (Oct. 23, 1998). As noted above, there is no evidence in our record, let alone "reliable evidence," regarding the children's wishes. That is, our record is devoid of any testimony or information considered by the juvenile court as

---

3. The single CASA report in our record raises concerns as to compliance with the responsibilities as set forth in Ohio Sup.R. 48.03. For example, the single report we have does not detail any interaction the CASA had with Mother or Father, and does not provide any recommendation of the best interest of the child.

4. Pursuant to App.R. 9(A) and 10(B), the clerk of the trial court is obligated to prepare the record on appeal, which includes a certified copy of the docket and journal entries, as well as all original papers and exhibits filed in the trial court.

relating to the children's wishes or their inability to express those wishes due to their young ages.

{¶ 54} Accordingly, we cannot discern from the juvenile court's decision and judgment entry that the court satisfied the statutory requirement that it consider the enumerated factor of R.C. 2151.414(D)(1)(b). The record does not demonstrate any consideration of the children's wishes, nor does it provide any information as to the children's maturity or capability to express those wishes. As such, we reverse the decision of the juvenile court and remand this matter for further proceedings.

{¶ 55} Upon remand, the juvenile court is instructed to consider the children's wishes as expressed by the children themselves or through the CASA and render a new decision regarding the children's best interests. The juvenile court shall also instruct the CASA to file the reports considered by the juvenile court. If the CASA reports do not reference the children's wishes, the CASA shall meet with the children and prepare a new CASA report reflecting the findings regarding the children's wishes and their level of maturity. If the parties have not previously reviewed the newly filed CASA reports, or in the event a new report is prepared, the juvenile court shall conduct a hearing on the sole issue of the children's wishes and render a new decision regarding the children's best interests.

{¶ 56} In light of the foregoing, we sustain Father's second assignment of error. The juvenile court's judgment is therefore affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

{¶ 57} Judgment affirmed in part and reversed in part.

HENDRICKSON and BYRNE, J., concur.