**[Cite as *In re K.P.*, 2022-Ohio-1347.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2021-11-016 |
| K.P. | : | O P I N I O N<br>4/22/2022 |
| | : | |
| | : | |
| | : | |
| | : | |

APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20193047

The Hobbs Law Office, and H. Steven Hobbs, for appellant.

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brinkman, Assistant Prosecuting Attorney, for appellee.

**M. POWELL, P.J.**

{¶ 1} Appellant ("Mother") appeals a decision of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of her son, K.P., to the Preble County Job and Family Services, Children's Services Division (the "Agency"). K.P.'s father ("Father") is not a party to this appeal.[1] Father and Mother were never married to

---

1. Father separately appealed the juvenile court's decision granting permanent custody of his son, K.P., to the Agency. On April 5, 2022, we upheld the juvenile court's decision and permanent termination of Father's parental rights. *In re K.P.*, 12th Dist. Preble No. CA2021-11-017, 2022-Ohio-1155.

one another.

**Facts and Procedural History**

{¶ 2}   The Agency became involved with Mother on June 28, 2019, the day K.P. was born, when it received a referral that Mother reported she had used marijuana and amphetamines two months prior to giving birth, heroin a few days before K.P. was born, and Suboxone on the day K.P. was born, and that K.P. was exhibiting withdrawal symptoms.   Four days after K.P. was born, his cord blood tested positive for fentanyl, buprenorphine, morphine, naloxone, amphetamines, benzodiazepines, methamphetamines, and cocaine.   At the time of K.P.'s birth, Father was incarcerated on drug charges and was set to be released in December 2021.   On July 3, 2019, the Agency filed a complaint alleging that K.P. was a dependent and abused child.   The juvenile court granted emergency temporary custody of the child to the Agency; the child was placed in foster care.   A CASA was appointed as the guardian ad litem for K.P. pursuant to R.C. 2151.281.   On August 22, 2019, the juvenile court adjudicated K.P. a dependent and abused child.   Bifurcation of the adjudicatory and dispositional hearings was waived and the juvenile court ordered that K.P. be placed in the temporary custody of the Agency.

{¶ 3}   A case plan was established for both parents.   The case plan required Mother to complete a drug and alcohol assessment, engage in drug and alcohol treatment, follow all recommendations from her treatment, undergo a psychological assessment, and remain clean and sober.   The case plan also required Mother to obtain and maintain employment and stable housing.

{¶ 4}   In February 2020, K.P. was placed with his current foster family; he was seven months old.   In July 2020, the Agency moved the juvenile court for an extension of its temporary custody order.   On July 24, 2020, the juvenile court extended temporary custody of K.P., finding that Mother "completed treatment through Sojourner and Full Circle.   Mother

did relapse in March 2020. She is now engaged in substance abuse treatment at Bright View in Cincinnati. Mother is now testing negative for all substances. Mother is employed. Mother attends visits consistently." In December 2020, the Agency moved the juvenile court for a second extension of its temporary custody order. In support of its motion, the Agency stated that

> There has been significant progress on the Child's case plan. Mother completed treatment through Sojourner and Full Circle. Mother relapsed in March 2020, but engaged in additional treatment at Bright View in Cincinnati. Mother is employed at Marathon. Mother obtained a new two-bedroom apartment with a co-worker[.] Mother has been inconsistent with visits due to transportation issues. Based on the progress, the Agency submits that a second extension of temporary custody is in the Child's best interest. Furthermore, there is reasonable cause to believe that the Child will be reunified with one of the parents, or otherwise permanently placed within the period of extension.
>
> Father remains incarcerated with an anticipated release date of June 21, 2021.

On February 17, 2021, the juvenile court once again extended temporary custody of K.P.

{¶ 5} During the proceedings, Mother's visits with K.P. initially occurred on a weekly basis. Mother's visits were subsequently transitioned to being off the Agency's grounds, then to overnight visits, and then to weekends at Mother's home. Eventually, a home visitation trial began on April 2, 2021. However, the 30-day home trial terminated on April 19, 2021, after the Agency received a referral that Mother was smoking marijuana in K.P.'s presence, leaving K.P. with other individuals at all hours of the night, and not providing care for the child.

{¶ 6} On May 28, 2021, the Agency moved for permanent custody of K.P. Both Mother and Father objected to the Agency's request for permanent custody. On June 23, 2021, the CASA filed a report recommending that permanent custody be granted to the Agency. In support of her recommendation, the CASA noted that temporary custody of K.P.

could no longer be extended, that Mother had failed to maintain an adequate home, that Mother had been inconsistent in her visits with K.P., and that Mother could not provide a stable home for the child during her upcoming incarceration. At the time of the CASA's report, Mother was facing pending incarceration in Indiana on drug charges that occurred *after* K.P.'s birth. The CASA's report further stated that the recent home trial visitation did not end well and that when K.P. subsequently returned to his foster family from the home trial, he was "extremely emotional," "would cry at everything and was very weary [sic.] of [the foster father] for about two weeks."

{¶ 7} A permanent custody hearing was held in September 2021. The juvenile court heard testimony from several witnesses, including Mother, the foster father, a caseworker, Mother's parents, and a family friend. Father was given the opportunity to testify on his own behalf but declined to do so. At the time of the hearing, Mother was incarcerated in Indiana on the drug charges referred to above and was not set to be released until January 16, 2022.

{¶ 8} Regarding Mother's substance abuse history and drug treatments, testimony at the hearing showed that when K.P. was born in June 2019, Mother had used heroin a few days prior to and Suboxone on the day K.P. was born and that she was on probation on drug charges. Shortly after K.P.'s birth, Mother incurred new drug charges which eventually led to her incarceration in Indiana from July 29, 2021, to January 16, 2022. As a result of her new 2019 drug charges, Mother attended a detoxification program at Sojourner in Eaton, Ohio. She then attended an inpatient addiction recovery program at Full Circle in Dayton, Ohio, starting on August 26, 2019. She successfully completed the program on March 4, 2020. Nonetheless, she relapsed later that month by operating a vehicle while under the influence of drugs or alcohol. In December 2020, Mother obtained a medical marijuana card but did not notify the Agency. The Agency learned about the

medical marijuana card in late April 2021 after the home visitation trial.

{¶ 9}  Mother next attended an outpatient recovery management program at CRC (Clermont Recovery Center), starting on January 20, 2021, and successfully completing it on June 4, 2021.  Despite the certificate of completion, narratives from CRC were contradictory as to Mother's progress during treatment.  The Agency presented evidence that Mother had not attended a group session since May 6, 2021, and that prior to that date, her attendance was spotty.  Mother conceded her attendance had been spotty but stated she "did the best [she] could."  During the CRC treatment program, Mother was regularly tested for 12 different drugs.  After obtaining her medical marijuana card, Mother regularly tested positive for marijuana; she further tested positive for cocaine on April 27, 2021.  Mother denied consuming marijuana or being intoxicated around K.P., denied using cocaine, and surmised the positive test for cocaine was a false positive.  Mother asserted she was clean since January 2020 save for her OVI relapse in March 2020.

{¶ 10} Regarding Mother's employment and housing, testimony at the hearing showed that Mother shared a two-bedroom apartment with a roommate during the home trial, an individual Mother suggested as a potential placement for K.P. during Mother's incarceration in Indiana.  However, Mother and the roommate had a falling out and the Agency never heard from the roommate.  Mother then moved in with her mother ("Maternal Grandmother") in New Paris, Ohio for a few months until her incarceration.  The caseworker testified that Maternal Grandmother's home was not appropriate for K.P. due to safety concerns, including Maternal Grandmother's prior drug use.  Mother testified she intended to get her own home upon release but acknowledged she had no housing set up.  The record shows that before her incarceration, Mother was working for a company in Blue Ash, Ohio, selling subscriptions for satellite radio and earning $13 an hour.  Mother testified she took a leave of absence from her job because of her incarceration but asserted she would

return to that job once she was released.

{¶ 11} Regarding Mother's visits with K.P. during the proceedings, testimony at the hearing showed that Mother visited K.P. weekly while she was attending her inpatient treatment program at Full Circle. In March 2020, the visits were temporarily suspended due to COVID-19. Thereafter, Mother's work schedule, her transportation issues, and the lack of personnel to monitor the visits prevented Mother from resuming visitation in August-September 2020. Once visitation transitioned to overnight visits in January-February 2021, and then to weekend visits, Mother consistently visited with K.P. A home trial followed on April 2, 2021, but was terminated on April 19, 2021, following a referral Mother was smoking marijuana in K.P.'s presence. Following the termination of the home trial, Mother did not visit K.P. for six weeks because of her transportation issues. The record shows that Mother was only able to attend one visitation between the termination of the home trial in April 2021 and her incarceration in July 2021. The record further shows that the foster family encouraged Mother to video chat with K.P. in addition to visitation; however, Mother video chatted with K.P. only three times between February 2020 and July 2021.

{¶ 12} The Agency presented evidence that K.P. had been living with his current foster family since February 2020, that he is very bonded with the foster family and that his foster family is meeting his needs, and that the foster family would like to adopt him. The caseworker testified about how Mother's positive test for cocaine following the completion of two substance abuse programs and while attending a third treatment program, Mother's marijuana use and failure to notify the Agency she had a medical marijuana card, Mother's present incarceration in Indiana and her resulting inability to care for K.P. until her release in January 2022, and Mother's lack of appropriate housing for K.P. prevented K.P.'s reunification with Mother.

{¶ 13} On October 21, 2021, the juvenile court granted permanent custody of K.P.

to the Agency. The juvenile court found that it was in K.P.'s best interest to grant the Agency permanent custody, that K.P. had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period (commonly referred to as the "12 of 22" provision), and that despite reasonable efforts by the Agency to prevent the need for placement of K.P. outside the home, K.P. could not and should not be placed with Mother or Father within a reasonable amount of time.

**Appeal**

{¶ 14} Mother now appeals the juvenile court's decision granting permanent custody of K.P. to the Agency, raising two assignments of error.

**Permanent Custody Standard of Review**

{¶ 15} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 14, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). Therefore, "[a]n appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re R.K.* at ¶ 13. This court will thus reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *Id.* However, even if the juvenile court's decision is supported by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence. *Id.*

{¶ 16} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses

- 7 -

and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases." *In re R.K.* at ¶ 15. Evidence susceptible to more than one construction will be construed to sustain the verdict and judgment. *Id.*; *Eastley* at ¶ 21.

**Two-Part Permanent Custody Test**

{¶ 17} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re R.K.*, 2021-Ohio-3074 at ¶ 16. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *Id.* Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *Id.* Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *Id.*

{¶ 18} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors.

This includes, but is not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re R.K.* at ¶ 18.

{¶ 19} "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 31. Furthermore, no one best-interest factor is given greater weight or heightened significance pursuant to R.C. 2151.414(D)(1). *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. Nor is any one factor dispositive. *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 25. R.C. 2151.414(D)(1) "does not prioritize the factors. The juvenile court must be free to use its discretion to determine the relative weight to be accorded to the factors based on the particular circumstances of the case before it." *In re J.L.M.*, 12th Dist. Butler Nos. CA2015-11-206 and CA2015-12-209 thru CA2015-12-211, 2016-Ohio-2773, ¶ 23.

**Analysis**

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE APPLICATION OF R.C. 2151.414(B)(1)(d) TWELVE MONTHS OF A CONSECUTIVE TWENTY-TWO MONTH PERIOD WHEN NUMEROUS AND LENGTHY DELAYS ARE OCCASSIONED BY THE WORLD-WIDE PANDEMIC VIOLATES THE MOTHER'S RIGHT TO DUE PROCESS. (sic.)

{¶ 22} As stated above, the juvenile court found that K.P. had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. This finding is supported by the record, as K.P. has been in the temporary custody of the Agency since August 2019.

{¶ 23} Mother does not dispute the juvenile court's time calculation. Instead, she argues that the juvenile court erred in terminating her parental rights based on a strict application of the 12 of 22 provision because COVID-19 health restrictions curtailed the Agency's ability to provide, and Mother's ability to engage in, reunification services. Mother asserts that "delays occasioned in large part due to the Agency restricting it[s] caseworkers from field work, the drug treatment programs going virtual, [and] the Court delaying in person hearings due to the global pandemic" violated her due process rights.

{¶ 24} On March 9, 2020, the governor of Ohio issued Executive Order 2020-01D declaring a state of emergency in Ohio in response to COVID-19. A national emergency was declared by the president of the United States on March 13, 2020. "There is no dispute that COVID 19 restrictions affected how case plans could be approached. The ability to utilize in-person services, such as visitation, was significantly restricted for a limited time." *In re K.R.*, 3d Dist. Shelby Nos. 17-21-12 and 17-21-13, 2021-Ohio-4474, ¶ 14. Indeed, Mother's visits with K.P. were temporarily suspended in March 2020 due to COVID-19. Nevertheless, the record reveals that COVID-19 pandemic restrictions did not prevent Mother from accessing case plan services or otherwise preclude her from abstaining from drug use, prevent her from attending online or telehealth services to address her substance abuse issues, or stop her from visiting with K.P., virtually or otherwise.

{¶ 25} Between K.P.'s removal from Mother's care on July 3, 2019, and when the COVID-19 pandemic began in March 2020, Mother attended and completed two substance abuse treatment programs, including Full Circle as an inpatient, only to have an OVI in

March 2020, and visited K.P. on a weekly basis. Once the COVID-19 pandemic began and safety precautions were put in place, the record reveals that Mother (1) was able to attend the CRC treatment program remotely but admitted her attendance had been spotty, (2) tested positive for cocaine during the CRC treatment program, (3) was unable to resume visits in August-September 2020 due her work schedule, her transportation issues, and a lack of personnel to monitor the visits, (4) consistently visited K.P. once visitation transitioned to overnight visits and weekends, (5) only once visited K.P. between April 2021 and her incarceration in July 2021 in part due to her transportation issues, and (6) video chatted with K.P. only three times between February 2020 and July 2021.

{¶ 26} Based upon the record before this court, we find that Mother was not deprived of her ability to be reunified with K.P. because of a strict application of the 12 of 22 provision or because of the COVID-19 pandemic, but rather, due to her own actions and choices. Mother has failed to demonstrate that COVID-19 restrictions prevented her from having a meaningful opportunity to work on the case plan for more than 12 months of a consecutive 22-month period. Therefore, Mother was not denied due process when the juvenile court considered whether, and subsequently found that, K.P. had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. *In re K.R.*, 2021-Ohio-4474.

{¶ 27} However, even assuming arguendo, that the juvenile court's "12 of 22" finding under R.C. 2151.414(B)(1)(d) does not or should not apply here, the second prong of the permanent custody analysis is nevertheless established. In addition to its "12 of 22" finding, the juvenile court also found that K.P. cannot be placed with Mother within a reasonable period of time or should not be placed with Mother, a finding Mother does not challenge on appeal. As stated above, only one of the findings under R.C. 2151.414(B)(1)(a) to (e) must be met to satisfy the second prong of the two-part permanent custody test. *In re R.K.*, 2021-

Ohio-3074 at ¶ 16. Accordingly, the juvenile court's finding that K.P. cannot be placed with Mother within a reasonable period of time or should not be placed with Mother is another statutory basis upon which the juvenile court appropriately awarded permanent custody to the Agency. *In re M.K.*, 12th Dist. Preble No. CA2011-07-003, 2012-Ohio-36, ¶ 64.

{¶ 28} Mother's first assignment of error is overruled.

{¶ 29} Assignment of Error No. 2:

{¶ 30} THE TRIAL COURT ERRED WHEN IT DETERMINED IT WAS IN THE CHILD'S BEST INTEREST TO AWARD THE AGENCY PERMANENT CUSTODY.

{¶ 31} Mother argues the juvenile court erred in finding it was in K.P.'s best interest to grant permanent custody to the Agency. To support this claim, Mother argues that the evidence does not support the grant of permanent custody to the Agency considering Mother's "significant nurturing relation" with K.P. which eventually progressed into a "thirty-day [home] trial period," Mother's "significant strides in the agency's case plan," and the fact Mother "affords [K.P.] and has afforded him [an] opportunity" for a legal secure placement by suggesting her roommate and then a family friend as potential caregivers during Mother's incarceration. Mother asserts she "consistently visited" with K.P. once she "finished her treatment, once her truck was repaired, [and] when the agency accommodated her work schedule[.]"

{¶ 32} Mother's argument implicates the juvenile court's consideration of K.P.'s interaction and interrelationship with Mother and whether K.P.'s need for a legally secure permanent placement can be achieved without a grant of permanent custody, two best-interest factors under R.C. 2151.414(D)(1)(a) and (d). Mother also cites her case plan progress, presumably as an unenumerated best-interest factor improperly weighed by the juvenile court.

{¶ 33} Mother achieved significant progress in satisfying her case plan's

- 12 -

benchmarks. However, "[t]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[S]ubstantial compliance with a case plan, in and of itself, does not prove that a grant of permanent custody to an agency is erroneous." *In re M.C.*, 12th Dist. Butler Nos. CA2014-07-152 and CA2014-07-162 thru CA2014-07-164, 2014-Ohio-5190, ¶ 32. "Moreover, while evidence of case plan compliance is usually relevant to the [juvenile] court's best [interest] determination, it is not dispositive of it." *Id.* Thus, a parent's case plan compliance will not preclude a juvenile court from awarding permanent custody to a children services agency when doing so is in the child's best interest. *In re J.M.*, 4th Dist. Highland Nos. 21CA13 thru 21CA16, 2021-Ohio-4146, ¶ 58.

{¶ 34} While Mother made strides in some areas of the case plan in that she was employed and shared an appropriate home with her roommate, an individual the Agency was seriously and actively considering as a potential temporary placement for K.P., such was no longer the case at the time of the September 2021 permanent custody hearing. By then, Mother was incarcerated on drug charges that occurred after K.P.'s birth and was not set to be released until January 2022; Mother and the roommate had a falling out, the Agency subsequently did not hear from the roommate, and the roommate was thus no longer a possible placement for K.P.; Mother's postrelease housing plan was unclear as she testified she had no housing set up but could temporarily live with the family friend; and while Mother planned to go back to her previous job in Blue Ash, Ohio from which she claimed to have taken a leave of absence, it is unclear whether she could maintain such employment while living in New Paris, Ohio with either Maternal Grandmother or the family friend as there is no evidence her transportation issues had been resolved.

{¶ 35} Despite attending three substance abuse treatment programs and

successfully completing two of them during the proceedings, Mother nevertheless had an OVI in March 2020, the same month she completed the Full Circle treatment program, and tested positive for cocaine in April 2021 while attending the CRC treatment program. Mother's submission of drug test results in conjunction with her CRC treatment program shows that Mother regularly uses marijuana since obtaining her medical marijuana card in December 2020. There is no evidence or verification of Mother's sobriety during the three-month period between her June 2021 completion of the CRC treatment program, her third substance abuse treatment, and the September 2021 permanent custody hearing. As for visitation, the record shows that throughout the proceedings, Mother alternated periods of consistent visitation with periods of missed visitation, in part due to her transportation issues. Further, the 30-day home trial abruptly ended after 17 days following a referral that Mother was smoking marijuana in K.P.'s presence and leaving him with other individuals at all hours of the night.

{¶ 36} Throughout the proceedings, the Agency explored possible placements for K.P., but was unable to locate a suitable alternative arrangement. In the separate case involving Father, the juvenile court granted permanent custody of K.P. to the Agency, finding that K.P. could not be placed with Father within a reasonable time because Father had no relationship with K.P. during most of K.P.'s life due to Father's incarceration on drug charges, and Father was subsequently unable to establish a significant relationship with K.P. and a stable period of sobriety during the three-month period between Father's release and the permanent custody hearing. As stated above, Mother suggested her then roommate but the two subsequently had a falling out and were no longer speaking, and the Agency thereafter never heard from the roommate. Following the failed April 2021 home trial, Mother then suggested the family friend; however, the family friend had never met K.P. and never moved for legal custody of K.P.

**{¶ 37}** In addition to the arguments Mother advances on appeal, the dissent asserts that the juvenile court committed reversible error by failing to address K.P.'s wishes in determining his best interest pursuant to R.C. 2151.414(D)(1)(b). As indicated above, Mother does not assign this as error or contend that the juvenile court erred by failing to consider K.P.'s wishes in awarding permanent custody to the Agency. On the contrary, Mother concedes that K.P.'s wishes are not an appeal issue because K.P. "is too young to express his wishes regarding custody and not mature enough to appreciate anything he expresses."

**{¶ 38}** App.R. 16(A)(7) provides that an appellant's brief shall contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions[.]" App.R. 12(A) provides that an appellate court "may disregard an assignment of error * * * if the party * * * fails to argue the assignment separately in the brief as required by App.R. 16(A)." Notwithstanding, a court of appeals has discretion to review an unassigned error:

> Our rules require that appellate courts "[d]etermine [an] appeal on its merits on the assignments of error set forth in the briefs under App.R. 16." App.R. 12(A). We have recognized, however, that while a court of appeals "need not pass on errors which were not assigned or argued, this power is discretionary." *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170 (1988). When a court does so, it "should * * * give the parties notice of its intention and an opportunity to brief the issue." *Id.*

*State v. Moore*, 154 Ohio St.3d 94, 2018-Ohio-3237, ¶ 17. *See also C. Miller Chevrolet v. Willoughby Hills*, 38 Ohio St.2d 298, 301 (1974).

**{¶ 39}** The dissent cites numerous cases recognizing the juvenile court's duty to consider all relevant factors, including the factors enumerated in R.C. 2151.414(D)(1), in determining whether permanent custody is in a child's best interest. We also recognize that the juvenile court must do so. We further emphasize that, notwithstanding the Ohio

Supreme Court's recent holding that a juvenile court's duty to consider the factors does not include the duty to "expressly discuss" them, the better practice is for the juvenile court to discuss them so there can be no question that each factor was considered. *See In re A.M.*, Slip Opinion No. 2020-Ohio-5102. But, because K.P. was barely two years old at the time of the permanent custody hearing and Mother has conceded K.P. was too young to express his wishes or appreciate the significance of such an expression, we decline to exercise our discretion to review whether the juvenile court's failure to specifically address K.P.'s wishes is error. The record reflects that K.P. was communicating in "toddler language" and common experience would confirm Mother's assertion that K.P. is too young to express his wishes. Under these circumstances, to reverse and remand for the juvenile court to specifically address the significance of K.P.'s wishes to its best-interest determination would be futile other than to highlight to the juvenile court the importance of discussing each of the best-interest factors.

{¶ 40} The dissent mischaracterizes our holding as finding that a child's age may relieve a juvenile court of the duty to consider a child's wishes in a permanent custody case. We hold no such thing. We merely recognize that K.P.'s age is a factor in this case upon which we rely in declining to exercise our discretion to review an issue that was neither assigned as error nor otherwise argued on appeal.

{¶ 41} Citing my dissenting opinion in *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, the dissent asserts that consideration of the R.C. 2151.414(D)(1) factors by the juvenile court is a mandatory duty which cannot be forfeited or conceded. I reiterate in the context of the case at bar what I stated in *Collins*, that a party need not draw to the juvenile court's attention its mandatory duty to consider the best-

interest factors to preserve the issue for appeal.[2] However, preserving the issue for appeal does not guarantee review unless the issue is assigned as error and argued on appeal. Simply because a trial court has a mandatory duty to do something does not relieve a party from raising on appeal the trial court's failure to observe that duty as required by the appellate rules.

{¶ 42} Finally, the dissent cites *In re Swisher*, 10th Dist. Franklin Nos. 02AP-1408 and 02AP-1409, 2003-Ohio-5446; *In re Ridenour*, 11th Dist. Lake Nos. 2003-L-146 thru 2003-L-148, 2004-Ohio-1958; and, indirectly, *In re Miller*, 5th Dist. Licking No. 04 CA 32, 2005-Ohio-856; and *In re Staten*, 2d Dist. Montgomery No. 17146, 1998 Ohio App. LEXIS 4959 (Oct. 23, 1998), as cases that have been reversed and remanded to the juvenile court for consideration of the child's wishes in permanent custody appeals. However, in each of those cases, the issue of the consideration of the child's wishes was raised on appeal. *See Swisher* at ¶ 24; *Ridenour* at ¶ 42; *Miller* at ¶ 10; and *Staten* at *2. Both *In re E.H.*, 12th Dist. Preble No. CA2021-11-012, 2022-Ohio-1190, and *In re E.H.*, 12th Dist. Preble No. CA2021-11-015, 2022-Ohio-1275, rely upon those cases. Neither of the *In re E.H.* cases stand for the proposition that a court of appeals, reviewing an award of permanent custody, must sua sponte review a juvenile court's consideration of the R.C. 2151.414(D)(1) best-interest factors when not raised in the appeal.

{¶ 43} As this court has previously recognized, "[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 44. The juvenile court's decision to grant permanent custody to the Agency does that. K.P. was

---

2. Our dissenting colleague disagreed with me in *Collins* and applied a plain error analysis because the issue of the ability to pay restitution was not raised in the trial court, despite the trial court's mandatory duty to consider the offender's ability to pay pursuant to R.C. 2929.19(B)(5). *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, ¶ 39-47 (J. Piper, writing for the majority).

removed from Mother's care on July 3, 2019, when he was four days old, and has been in foster care ever since. He was adjudicated a dependent and abused child because his cord blood tested positive for seven different substances, including cocaine. At the time of the September 2021 permanent custody hearing, K.P. had been out of Mother's custody for over two years; K.P. had been residing with his current foster family for over one and one-half years; and Mother had been unable to substantially remedy the conditions that caused K.P.'s removal. Moreover, she was incarcerated on drug charges and was not set to be released until January 2022. "A parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the child's removal." *In re W.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-Ohio-3051, ¶ 41.

{¶ 44} K.P. has been in the Agency's custody for over two years and no longer qualifies for temporary custody under R.C. 22151.415(D); K.P. does not meet the requirements for a planned permanent living arrangement under R.C. 2151.353(A)(5); and prior to the permanent custody hearing, no relative or other interested person had filed a motion for legal custody of P.K. By contrast, K.P. has been living in his foster home since February 2020, is bonded with his foster parents, and is doing very well. K.P.'s foster parents have indicated their desire to adopt K.P. It is the best interest of the child, not a parent's preferred outcome, that is controlling. *In re K.M.*, 12th Dist. Butler No. CA2019-01-015, 2019-Ohio-1833, ¶ 67.

{¶ 45} Thus, despite Mother's positive relationship with K.P., her failure to achieve the necessary stability to permit K.P. to return home during the 22-month period between the time of K.P.'s removal from Mother's care and the filing of the permanent custody motion resulted in K.P.'s integration into his foster family's home. K.P. was only seven months old when he was placed with his current foster family. By the time the permanent custody motion was filed, K.P. had been with his foster family for 15 months. K.P.'s foster family

has provided for all of his needs and wants to adopt him. By contrast, by the time of the permanent custody hearing, K.P. could still not return home with Mother because she was incarcerated. Even upon Mother's release from incarceration, significant uncertainty remained regarding her housing, employment, and transportation.

{¶ 46} In this case, the R.C. 2151.414(D)(1)(a) best-interest factor favors an award of permanent custody based upon K.P.'s interaction and interrelationship with his foster family. The R.C. 2151.414(D)(1)(c) best-interest factor also favors an award of permanent custody based upon the 22-month pendency of this case where K.P. was in the Agency's temporary custody and placed with his foster family for the last 15 months of that time. Finally, the R.C. 2151.414(D)(1)(d) best-interest factor favors an award of permanent custody because there is no other viable dispositional alternative providing permanency to K.P. The foregoing best-interest factors predominate in this case and support the award of permanent custody.

## Conclusion

{¶ 47} In light of the foregoing, we find that the juvenile court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Therefore, the juvenile court did not err by granting permanent custody of K.P. to the Agency.

{¶ 48} Mother's second assignment of error is overruled.

{¶ 49} Judgment affirmed.

S. POWELL, J., concurs.

PIPER, J., dissents.


**PIPER, J., dissenting.**

{¶ 50} While I respect and understand the foregoing opinion of my colleagues, I

- 19 -

perceive the weight of the evidence differently than they ultimately determine.[3]  Beyond disagreeing in how the evidence is weighed, my efforts are aimed at examining the majority's rationale and reasoning which, in my opinion, significantly diverges from what the law requires.

{¶ 51} Mother argues there was not clear and convincing evidence contained in the record supporting the award of permanent custody.  The argument challenges the juvenile court's determination as being against the manifest weight of the evidence regarding K.P's best interest.  Mother believes her constitutional parental right to raise her child was unfairly terminated and that it would be in K.P.'s best interest to be raised by Mother.  Appellate review requires the juvenile court's consideration of the statutory best interest factors.

{¶ 52} An appellate court reviewing the record will reverse the granting of permanent custody if there is sufficient conflict in the evidence.  *In re R.K.,* 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 13.  Even if the juvenile court's decision is supported by sufficient evidence, an appellate court may still conclude the granting of permanent custody is contrary to the manifest weight of the evidence.  *In re A.A.,* 12th Dist. Clermont No. CA2015-12-098, 2016-Ohio-2992, ¶ 7, citing *In re T.P.,* 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

### Direction From *In Re A.M.*

{¶ 53} Appellant's challenge to the manifest weight of the evidence in the granting of permanent custody necessarily requires evaluating whether the juvenile court considered *all* the best interest factors as required by law.  *In re A.M.,* Slip Opinion No. 2020-Ohio-

---

3. In ¶ 40 the majority disavows my characterization of their "holding."  Yet, I've declined to restate the majority's "holding" pertaining to the requirement that all best interest factors be considered as it remains obscure to me.  While the majority may find it "futile" or a waste of time to require a consideration of all the best interest factors, I do not.  I am concerned for the misimpressions gleaned from our majority opinion, which judges and practitioners may employ in future permanent custody proceedings.  When it comes to weighing the evidence, I see the glass more full, falling far short of the "clear and convincing" standard.  Yet, I remain respectful of the majority's disagreement.

5102. The majority misperceives that they have the discretion to decide when a juvenile court's failure to consider a best interest factor is contrary to the statute. Majority opinion at ¶ 38-40 (majority declines to "exercise [their] discretion"). Ironically, the majority addresses the factor which the juvenile court failed to consider and determines, for the first time on appeal, that it is "futile" to consider the factor either because of the child's age or because Mother has waived or forfeited consideration of the factor.

{¶ 54} The Ohio Supreme Court recently discussed in detail the statutory framework of R.C. 2151.414(D)(1)(a)-(e). In the majority opinion (with a dissent not much different from what the majority "strongly encouraged"), the supreme court articulated that "all" of the statutory best interest factors *must* be considered when considering an award of permanent custody. *In re A.M.* at ¶ 42. The requirement that all the factors are reflected in the record as being considered is not discretionary.

{¶ 55} The supreme court noted that a detailed written discussion or factual findings were not statutorily required; however, the record nevertheless must demonstrate the juvenile court did, in fact, consider, or reflect upon, each statutory factor. *Id.* at ¶ 31. The supreme court noted a preference for at least some discussion of each factor in order to aid appellate review and, importantly, solidify public confidence in the judicial process involving children and "this most important area of parental rights." *Id.* at ¶ 32, 42.

{¶ 56} Ohio's highest court determined that to "consider" the factors means "to reflect on: think about with a degree of care or caution." *Id.* at ¶ 25. The majority opinion "strongly encouraged" "the best practice" of specifically addressing each factor. *Id.* at ¶ 32. Even *In re A.M.*'s dissent would appear to have no disagreement since it advocates that the juvenile court provide "an adequate basis" as to the application of each factor. *Id.* at ¶ 49. While the juvenile court's decision contained "generic language not tailored to the facts of [the] case," the supreme court ultimately found the juvenile court's decision sufficiently reflected

upon the factors such that it "obviously" considered all the factors. *Id.* at ¶ 34-35. *See also In re K.P.*, 8th Dist. Cuyahoga No. 107577, 2019-Ohio-181, ¶ 37 (where the Eighth District foreshadowed *In re A.M.,* and determined that because the juvenile court outlined its reasoning in its entry, it considered all the required statutory factors). What the juvenile court "considered" or "reflected upon with care or caution" must be, even if marginally, within the juvenile court's decision or demonstrated within the record. *Id.* at ¶ 39-40.

### Consideration Of Factors In The Record

{¶ 57} In weighing the best interest of a child in permanent custody proceedings, R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for maturity of the child." There must be clear and convincing evidence in the record that there was an investigation into the wishes of the child in order to support a determination that the juvenile court "considered" the wishes of the child. *In re H.M.*, 3rd Dist. Logan Nos. 8-13-11 thru 8-13-13, 2014-Ohio-755, ¶ 30. The juvenile court may rely upon the guardian ad litem's ("GAL") report filed with the juvenile court to determine the child's desires, whether the child can express preferences, or whether the child has sufficient maturity to communicate meaningfully. *Id.*

{¶ 58} The Agency determined that K.P. is able to communicate with his foster parents in his "toddler language," evidencing his close relationship with them. Despite his ability to communicate "well" in his "toddler language," there is no mention from the Court Appointed Special Advocate ("CASA") as to K.P.'s desires or communications with, or regarding, Mother. Nor does the record reveal what communication efforts K.P.'s advocate attempted with K.P. nor what K.P.'s communication capabilities are. The failure to address

this best interest factor is reversible error.[4]  *See, e.g.*, *In re E.H.*, 12th Dist. Preble No. CA2021-11-012, 2022-Ohio-1190, ¶ 43; *In re Swisher*, 10th Dist. Franklin Nos. 02AP-1408, 02AP-1409, 2003-Ohio-5446, ¶ 40; *In re Ridenour*, 11th Dist. Lake Nos. 2003-L-146 thru 2003-L-148, 2004-Ohio-1958, ¶ 46-48.  Despite the majority's constructed proposition for this court's *In re E.H.* opinions, both cases were reversed due to the failure to consider all of the best interest factors.  The potential value to any statutorily required considerations is not ours to decide for the first time on appeal.   In this regard, the majority takes a misstep upon the proverbial slippery slope.

{¶ 59} My friends in the majority suggest a statement in Mother's brief concedes, or forfeits, that the required statutory best interest factor regarding the child's wishes does not have to be considered by the juvenile court due to K.P.'s age.  Majority opinion above at ¶ 37-39.  Somewhat inconsistently, the majority simultaneously suggests that Mother failed to argue or brief the issue on appeal.  Above at ¶ 37.

{¶ 60} First, it is incongruent to suggest that an appellant concedes or forfeits an argument for the first time on appeal while simultaneously determining that the issue was not raised.  It appears to be strained reasoning.  One cannot cast away what one did not hold in the first place; one does not concede that which was not raised.  Secondly, an affirmative statutory obligation of a court cannot be avoided.  A party cannot forfeit or concede a mandatory duty placed upon the judiciary by the legislature, particularly when the duty is well recognized by Ohio courts.  R.C. 2151.414(D)(1) ("In determining the best interest of a child * * * the court *shall* consider *all* relevant factors, including, but not limited to," factors [a] through [e]) (Emphasis added.); *In re Schaefer*, 111 Ohio St.3d 498, 2006-

---

4. "Where a trial court relies upon * * * information that might otherwise be unapparent in the record, [it] must ensure that the information is made part of the record in order for a reviewing court to perform its duty." *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, ¶ 55 (M. Powell, J., concurring in part and dissenting in part).  *See also* App.R. 9(A).

Ohio-5513, ¶ 56 ("The court *must* consider *all* of the elements in R.C. 2151.4141(D) as well as other relevant factors") (Emphasis added.); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 57 (stating that in its best-interest analysis, "a court must consider 'all relevant factors,' including five enumerated statutory factors, one of which is the wishes of the child").

{¶ 61} Lastly, there is voluminous Ohio precedent that all the enumerated best interest factors must be considered by the juvenile court. In fact, *stare decisis* controls this matter as we, the Twelfth District, like other appellate districts, have reversed where the children were of tender age, but the record did not demonstrate that the relevant best interest factor was considered. *In re E.H.*, 2022-Ohio-1190 at ¶ 43; *In re E.H.*, 12th Dist. Preble No. CA2021-11-015, 2022-Ohio-1275, ¶ 54 (each opinion reversing and remanding for the juvenile court to consider the wishes and maturity levels of the three children who were ages seven months, two years, and three years respectively at the time of the permanent custody hearing).[5]

{¶ 62} Our majority opinion in effect establishes there will be cases in which they will determine reversal is "futile" because statutory compliance is unnecessary in their opinion and not all best interest factors must be considered by the juvenile court despite the clear and unambiguous language in the statute. Above at ¶ 39.[6] The majority opinion gives no guidance as to how far our court might go in deciding when, and under what circumstances, a best interest factor need not be considered. *See In re Swisher*, 2003-Ohio-5446 at ¶ 36-37, 41 (reversing a permanent custody award to the agency where the juvenile court did not consider the wishes of the children, involving a three-year-old child); *In re Ridenour*,

---

5. If neither party files a request for an en banc consideration by this court, we might well be advised to sua sponte contemplate such a consideration. App.R. 26(A)(2)(b).

6. The majority opinion is in conflict with other appellate districts, which have held that a trial court commits reversible error when it fails to consider one of the mandatory best-interest factors of R.C. 2151.414(D)(1). *See, e.g., In re B/K Children*, 1st Dist. Hamilton No. C-190269, 2019 Ohio App. LEXIS 3307, *8 (Aug. 9, 2019). Those courts did not invoke their own discretion.

2004-Ohio-1958 at ¶ 56 (same).

{¶ 63} A permanent custody case is no less important than a criminal case. *See In re D.W.*, 12th Dist. Clinton Nos. CA2018-10-018 and CA2018-10-019, 2019-Ohio-762, ¶ 28 quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997) ("'[T]he permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case'"). In a criminal case where, statutory factors are not fully considered, we routinely reverse so the trial court can consider all factors required by the statute. *See, e.g., State v. Singh*, 12th Dist. Warren No. CA2020-09-056, 2021-Ohio-2158, ¶ 48 (finding the trial court failed to address all three findings required by R.C. 2929.14[C][4] and remanded the case for the trial court to resentence the defendant and make the necessary findings before imposing consecutive sentences). In those instances, we do not review the record to see if it is "futile" to reverse. Oftentimes, after the factors are fully considered by the trial court the defendant receives the same identical sentence. Yet, importantly, the law has been complied with – a mission of appellate review, never to be considered futile.

{¶ 64} While a party may forfeit her rights, she cannot forfeit a mandatory duty imposed on trial courts; rather, "it is incumbent on the trial court to follow the plain meaning of the statute." *See State v. Banks*, 8th Dist. Cuyahoga Nos. 102360 thru 102363, 2015-Ohio-5413, ¶ 30. Here, "[Mother] did not need to bring the matter to the attention of the [juvenile] court as the [juvenile] court's attention is directed to the matter by [statute]," or in other words, by operation of law. *Collins*, 2015-Ohio-3710 at ¶ 50 (M. Powell, J., concurring in part and dissenting in part).[7] R.C. 2151.414(D)(1) places such a mandatory duty upon

7. In Footnote 2, my colleague writing for the majority reflects upon my disagreement with his conclusion in *Collins*. In *Collins*, the trial judge expressly indicated it *considered* the defendant's present and future ability to pay restitution before ordering restitution be paid. The consideration, as expressed by the trial court in its entry, complied with the law. Additionally, at the time we decided *Collins*, there was no guidance from the Ohio Supreme Court articulating what is meant when something is "considered." In the matter currently before us, the juvenile court *never* expressed that it considered all the best interest factors, and the record does not

the juvenile court which cannot be avoided.

**Weighing The Evidence**

{¶ 65} In evaluating the best interest factors, Mother argues her initial unavailability of housing, her efforts toward substance abuse recovery, her temporary vehicle inoperability, and her incarceration for an offense which occurred shortly after K.P.'s removal, should not weigh against her. Mother proposes that during her periods of difficulty there were placements available which did not necessitate the continued placement with the foster family. Mother emphasizes her participation in the case plan was positive despite her struggles and concludes the juvenile court lost its way in determining permanent custody to the Agency was in K.P.'s best interest. Upon reviewing the record, I agree.

{¶ 66} K.P. was taken away at birth because of Mother's use of illegal substances during her pregnancy.[8] The Agency and CASA emphasizes that K.P. is bonded to the foster parents, which is a surprise to no one. An infant baby boy growing into a 2-year-old is naturally going to be bonded to the people nurturing him for two years – feeding him, playing with him, teaching him to walk, reading to him, bathing him, teaching him to talk, and putting him to bed. While a consequence of her own past failure, Mother was reduced to a distant "visitor" from the beginning.[9]

{¶ 67} Maternal Grandmother was proposed as a family placement, which would have permitted frequent, in depth, contact with Mother, but this was rejected by the Agency

---

demonstrate *all* the factors were considered. *See In re A.M.* While my conclusion in *Collins* was opposite my colleague, the reasoning he offered therein remains poignant.

8. Regretfully, according to 2017 data from the Heathcare Cost and Utilization Project, 80 newborn babies are diagnosed with Neonatal Abstinence Syndrome (NAS), a type of opiate withdrawal, in the United States every day. This equates to approximately one baby being diagnosed with NAS every 19 minutes. Center for Disease Control and Prevention, *Pregnancy Data and Statistics* (July 16, 2021), https://www.cdc.gov/pregnancy/opioids/data.html (accessed Apr. 13, 2022).

9. In fact, Mother complained that her biweekly visits with K.P. were too infrequent. Her time for bonding was too short.

due to undocumented "suspicions" Maternal Grandmother might use drugs. Yet the record contains no evidence, clear and convincing or otherwise, that such "suspicions" are founded in established facts. Home investigation for placement purposes is the Agency's responsibility and usually would take place routinely – but not here.

{¶ 68} Once Maternal Grandmother was rejected, a family friend was suggested for placement. The Agency summarily gave no consideration to the family friend because he had never met K.P. and K.P. was already living with the foster parents. Admittedly, at the time Mother suggested placement with the family friend, the Agency was already seeking permanent custody of K.P. with plans for an adoption. Nothing in the record reveals, clear and convincing or otherwise, that placement with the family friend was ill suited or otherwise required disqualification. K.P.'s advocate, at least as reflected from the advocate's report and the record in general, had no contact with Maternal Grandmother or the family friend. Yet a CASA volunteer is to fulfill the responsibilities and duties of a guardian ad litem. R.C. 2151.281(H); Sup.R. 48.03. A CASA volunteer may be trained by, or in association with, the Agency, yet the advocate's duties are to be exercised independently. R.C. 2151.281(J)(2); Sup.R. 48.03(A)(2)

{¶ 69} The juvenile court found the reason for the initial removal was not remedied by Mother. Such is an impossibility. Mother's lack of protecting her unborn baby during pregnancy can never be remedied. The poor judgment Mother exercised during pregnancy should forever be upon her conscience, but while Mother cannot change the past, she has shown progress toward correcting the future. Mother's commitment, despite difficulties, displays a significant effort to remedy her past lifestyle. The record documents Mother has made "significant progress" following through with the case plan. Mother's isolated fall with drug use (which she denies) is no different than a recovering alcoholic. Some who slip up, get up. If every graduate of Drug Court was terminated for a slipup, most would never reach

graduation.

**{¶ 70}** Mother's resiliency in participating in treatment signals growth from past immaturity in order to provide a safe and stable family environment for K.P. Mother's responses are unlike those in *In re J.P.*, 8th Dist. Cuyahoga No. 107849, 2019-Ohio-1657, where the GAL noted that the mother's drug use negatively impacted her daughter, including the mother overdosing in the child's presence. *Id.* at ¶ 28. The mother minimized her several overdoses as just "nod offs," unrelated to drug use, and did not understand why the "nod offs" were so upsetting to her child. *Id.* Here, there is no evidence Mother's sole alleged slip had any impact on her ability to continue with treatment and raise K.P. *See In re A.V.*, 12th Dist. Warren Nos. CA2021-04-030 thru CA2021-04-033, 2021-Ohio-3873, ¶ 23-35 ("Without some evidence that the children's environment has been affected in some negative way by [the parent's] drug use, there is no clear and convincing evidence of dependency"). The Agency's "concerns" exist through the record yet no one testifies Mother's success is hopeless, impossible, or unlikely.

**{¶ 71}** The Agency gives repeated emphasis to Mother's *past* drug use while simultaneously acknowledging she had made "significant progress." The Agency also referenced Mother's "regression" for marijuana while acknowledging it did not know Mother had a medical marijuana card. The inconsistencies and uncertainties threaded throughout the record reveal "sufficient conflict."

**{¶ 72}** Nevertheless, it is the best interest of K.P. that is being considered, and the little one's need for stability remains paramount. A parent's constitutionally protected interest in raising his or her child is not absolute and is always subject to the ultimate welfare of the child. And indeed Mother, like most parents, is not mistake free. But the record is not clear and convincing in establishing that a stable, safe environment is incapable of being

produced by Mother.[10]   While the Agency approves of adoption by the foster parents because it is a better home – there is always potentially a better home.

{¶ 73} Mother's incarceration for a misdeed committed shortly after K.P.'s birth and prior to Mother's case plan successes should not be used to diminish the positive changes she has made and seeks to make in the future.  Mother "admitted" her behavior that led to removal, has since then participated in parenting classes, completed treatment at Sojourner, Full Circle, and the Clermont Recovery Center, and sought treatment after an isolated relapse in March 2020.  Mother participated in pursuing a GED and has completed her incarceration that stemmed from behavior shortly after K.P.'s removal.  Mother evidently has a support system in place as well – she lived with Maternal Grandmother prior to her incarceration and both parents testified on her behalf at the hearing.

**Conclusion**

{¶ 74} The evidence is not clear and convincing in establishing that it is in K.P.'s best interest to be separated from his family via permanent custody and a planned adoption. Mother is correct in suggesting the statutes permitting temporary custody, case plans, supervision, extensions, and the like, are aimed at achieving the reunification of families, not at dividing them. I have immense empathy, and admiration, for the foster parents wanting to adopt a baby, yet K.P. is Mother's child.  It is a mistake to continuously focus on past misdeeds with a blind eye to the accumulating corrective efforts toward building a positive, stable future.  Although I understand the foster parents are eager to adopt a baby, I see no reason that time was of the essence in this particular case, especially with a child so young.  Neither Mother's inability to raise her own child nor K.P.'s inability to bond with,

---

10. If removed at age two from the foster parents, disruption to K.P's environment would be little and not lasting at such a young age. A little more assistance in facilitating Mother in correcting past frailties would have gone a long way in serving the fuller, more noble, purpose of reunification.

and be raised by, his natural mother, was established by clear and convincing evidence. The evidence was not clear and convincing in establishing Mother cannot provide a stable environment in which to raise K.P.  I would reverse because the grant of permanent custody in these circumstances was contrary to the manifest weight of the evidence.