[Cite as *In re J.L.S.*, 2026-Ohio-1312.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | | CASE NO. CA2025-11-124 |
| J.L.S. | : | |
| | | <u>OPINION AND</u> |
| | : | <u>JUDGMENT ENTRY</u> |
| | | 4/13/2026 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2023-0210

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Legal Aid Society of Southwest Ohio, and Jamie Lee Landvatter, guardian ad litem.

---

**O P I N I O N**

**SIEBERT, J.**

{¶ 1} Appellant, "Mother," appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of her son, John,[1] to the

---

1. "John" is a pseudonym adopted for this opinion for the purposes of privacy and readability. *See State v. Cansler, 2025-Ohio-2558*, ¶ 1, fn. 1 (12th Dist.); Supreme Court of Ohio Writing Manual 115 (3rd Ed. 2024). This opinion uses pseudonyms for all children referenced.

Butler County Department of Jobs and Family Services ("the Agency"). Mother asserts with her two assignments of error that the juvenile court's decision is against the manifest weight of the evidence and that she received ineffective assistance of counsel when her trial attorney failed to file a motion on behalf of a relative for John to be placed with that relative. We overrule both assignments of error. Despite Mother's commendable and demonstrated progress to address her substance abuse and other issues, it was not against the manifest weight of the evidence to grant permanent custody to the Agency. We cannot summarize the reasons for this any better than the magistrate did:

> Mother started this case at a legal disadvantage because her parental rights had been involuntarily terminated regarding [John's] sibling. She compounded this disadvantage by deciding that it would be best for her to relocate to Rhode Island, leaving [John] here in Ohio in the care of the [S]tate. That decision, coupled with her decision to remain in Rhode Island and to rely on the possibility of an [interstate] placement profoundly and negatively affected her ability to form a parental bond with John and permitted, by her voluntary absence, that bond to be formed with the foster family.

We also find no ineffective assistance of counsel because, even if we agreed that trial counsel's performance was deficient for not filing a motion for custody on behalf of a relative (which we do not), Mother admits one can only speculate on how the court would have ruled on such a motion. Mother did not meet her burden to demonstrate she suffered prejudice as a result of the allegedly deficient assistance of counsel.

**Background**

{¶ 2} The underlying facts of this case are largely uncontested. Mother has given birth to five children, of which John is the fourth. This case is not her first contact with the Agency or with children's services in general. Two of Mother's children were involved in proceedings in Rhode Island that resulted in their open adoption by their maternal grandmother. In November 2022, the Agency received permanent custody of John's

elder sibling, "Alice." Mother gave birth to John on June 21, 2023. Mother admitted to illicit drug use during her pregnancy with John, and while initial results were negative, John showed signs of drug withdrawal and was placed in a neonatal intensive care unit (NICU). Mother testified that she left the hospital against medical advice and that she expected the Agency would get temporary custody of John due to her addiction. The Agency took temporary custody of John on June 23, 2023, and the trial court subsequently found him to be both an abused and dependent child.[2] It should be noted that John's biological father took no active role in this case and did not appear at any court dates due to warrants related to theft offenses. However, Father has lived with Mother during most of the proceedings.

{¶ 3}  Mother's case plan with the Agency (filed August 11, 2023) required her to seek substance abuse and mental health services, obtain safe housing for herself and John, and to maintain income. However, Mother moved to Rhode Island that same month. Mother asserted she did so in order to get substance abuse treatment and to be near family support, but Mother admitted she never sought out services in Ohio before leaving the State. Mother also had no contact with John before going to Rhode Island.

{¶ 4}  While in Rhode Island, Mother completed intensive inpatient and outpatient treatment.[3] Mother did not engage with dedicated mental health services in Rhode Island or Ohio beyond taking some initial assessments, but her substance abuse treatment included some counselling to address mental health issues. Despite Mother's

---

2. An "abused child" means, for purposes of this case, a child who "[e]xhibits evidence of any physical or mental injury . . . inflicted other than by accidental means . . . [and] [b]ecause of the acts of the child's parents . . . suffers physical or mental injury that harms or threatens to harm the child's health or welfare." R.C. 2151.031(D), (E). A "dependent child" means, for purposes of this case, a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C).

3. Mother tested positive for Fentanyl while participating in that program, but it is unclear whether it was a "false positive." Mother has, by all appearances, maintained sobriety from illicit drugs since her return to Ohio.

participation in the Rhode Island substance abuse programs, an Agency supervisor familiar with this case testified "it was really difficult to communicate with the providers in Rhode Island," and as a result the Agency "really [did not] know what was going on with [Mother] or [Father]." While in Rhode Island, Mother had another child, "Carrie." Though a Rhode Island children services case was opened as to Carrie, it was ultimately closed, and there are no current cases regarding Mother's care of Carrie in any state.

{¶ 5} Mother began video visits with John in November 2023. After Mother returned to Ohio in September or October 2024, she began in-person visits with John in November 2024. Mother leased a single bedroom in a home through her employer and shared common spaces with another tenant that lived there. Mother originally lived there with John's biological father as well as Carrie. While Father no longer lived there at the time of the permanent custody hearing, she asserted that she planned to reunite with him. Mother admitted that the house was not large enough to accommodate John should she regain custody. However, Mother testified she applied for assistance to be placed in more appropriate housing.

{¶ 6} John remained in the Agency's custody throughout the proceedings, and the Agency filed a motion for permanent custody in December 2024. From the beginning of the case, the Agency placed John with the same foster family that adopted John's elder sister Alice. That family intends to adopt John as well if the Agency maintains permanent custody. John is bonded with the foster family, calling his foster parents "mommy" and "daddy." John also bonded with the other children of his foster family, which includes Alice.

{¶ 7} Both Mother and Father visited John consistently after moving back to Ohio. Those visits went reasonably well, though Mother and Father sometimes got into arguments and needed to be redirected by visitation staff. No overnight visits were ever

scheduled because Mother and Father were not engaged in local Agency-referred services and because Father had active warrants out for his arrest. The Agency does not contest that John and Mother are bonded, but an Agency supervisor testified "the bond between the adults that take care of [John] on a regular basis that he lives with is a different bond than what he is developing with [Mother]" during visits.

{¶ 8} Though the Agency anticipated placing John with his foster family if it received permanent custody, three home studies of paternal relatives were conducted to see if they could serve as a possible placement for John. One paternal aunt's ("Aunt") home study was approved. Aunt also visited John in person during the proceedings. At the permanent custody hearing, Aunt testified that she wanted to see John "reunited with his family" and agreed that "[i]t's important that [he] go to [Mother] and [Father]." Aunt further testified she told both Mother and Father that she would work with the Agency to have John placed with her, but they told her they were "working so that [they] could get [John] back [themselves]." After the Agency denied another paternal aunt's home study, Aunt testified she "spent a long time" trying to reach out to a social worker regarding having John placed with her. Despite all of this, no motion was ever filed for John to be placed with Aunt.

{¶ 9} At the permanent custody hearing, the Agency argued it should be granted permanent custody of John, noting that John's foster parents are effectively "the only parents that he knows" after Mother and Father left him to go to Rhode Island. The Agency also noted that since returning to Ohio, neither parent engaged in any services, that Mother's rented space had no room for John, and that Mother did not have control over who rented other space in the home and shared common areas. Mother, in turn, asserted she had "done everything [she was] supposed to do" to show "that [she was] not that same person" and could love and nurture John. Mother further asserted that

"[the Agency] failed me and my son." John's guardian ad litem argued the Agency should receive permanent custody of John and that Mother's actions were ultimately "too little, too late."

{¶ 10} The magistrate recommended the Agency's motion for permanent custody be granted. Mother objected to the magistrate's recommendation, but the trial court overruled the objections and adopted the magistrate's opinion.

{¶ 11} This appeal followed.

**First Assignment of Error: Manifest Weight of the Evidence**

*Standard of Review:*

{¶ 12} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.).

{¶ 13} To determine whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.).

Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the trial court's judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

*Applicable Law*

{¶ 14} This court finds it necessary to provide an overview of the fundamental rights at issue in this case, as well as the statutory scheme the Ohio legislature developed to protect those fundamental rights. This overview will provide (1) an accurate legal framework within which Mother's arguments can be addressed; and (2) an explanation as to how certain statutory provisions within this framework weighed so heavily against Mother.

<u>Balancing a Parent's Fundamental Rights with a Child's Wellbeing</u>

{¶ 15} We start with the constitutional principle that parents have a fundamental right to raise their children, and this right is protected by both the United States and Ohio Constitutions. *See e.g., Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *In re R.G.M.*, 2024-Ohio-2737, ¶ 16. But just because a right is constitutionally protected as "fundamental," does not mean that right is without limits. For example, freedom of speech is unquestionably protected under both the federal and state constitutions. U.S. Const., amend. I; Ohio Const., art. I, § 11. Yet, certain categories of speech lie "fully outside the protection of the First Amendment, . . . for example, . . . child pornography." *United States v. Stevens*, 559 U.S. 460, 471 (2010). Why? Because child pornography is "intrinsically related" to the underlying abuse of children. (Cleaned up.) *Id.* Likewise, a parent's "fundamental" right to parent their children is limited because it is balanced against the child's "basic rights to adequate care and to be free from abuse and neglect." *In re R.G.M.* at ¶ 16. "Therefore, a parent's rights begin to wane once his or her child is found to have suffered from abuse, neglect, or dependency." *Id.*

{¶ 16} Within the backdrop of balancing a parent's fundamental rights to raise their children against a child's right to be free from abuse and neglect, the General Assembly crafted a statutory scheme that seeks to protect both *See generally* R.C. Ch. 2151. That statutory scheme—which courts must "liberally interpret [] and construe []"— seeks to "to effectuate the following purposes:"

> (A) To provide for the care, protection, and mental and physical development of children . . .whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety;

> (B) To provide judicial procedures through which . . . the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced.

R.C. 2151.01.[4]

{¶ 17} Consistent with the first purpose of the statute—separating families only when necessary—the Agency is generally required to make "reasonable efforts to prevent the removal of [a] child from the child's home, eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." *See* R.C. 2151.419(A)(1) ("Reunification Efforts"). Importantly, "'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.); *see also In re S.H.*, 2020-Ohio-3499, ¶ 13 (12th Dist.), quoting *In re K.M.*

{¶ 18} The second purpose—protecting the constitutional and legal rights of both

---

4 Our sister district has observed "[t]he [permanent custody] statutes appropriately reflect the need to balance the extraordinarily significant rights and interests: parents' rights and interest in the custody, care, nurturing, and rearing of their own children, and the [S]tate's . . . interest in providing for the security and welfare of children under its jurisdiction, in those unfortunate instances where thorough and impartial proceedings have determined that the parents are no longer in the best position to do so." *In re Thompson*, 2001 WL 424044, *6 (10th Dist. Apr. 26, 2001).

parents and children—can be seen throughout the statutory requirements to grant permanent custody as well as case law interpreting those requirements. *See, e.g.,* R.C. 2151.414(B)(1) (requiring clear and convincing evidence that it is in best interests of child to grant an agency permanent custody); *see also In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.) (finding State required to prove by clear and convincing evidence the statutory standards for permanent custody have been met).

<u>When Reunification Efforts Are *Not* Required</u>

{¶ 19} Certain actions can severely impact that parent's ability to regain custody of a child, even if the initial removal was considered "temporary." The "Reunification Termination Factors" ask whether a child's parent has: (1) been convicted of or pled guilty to a crime involving the child or another child living in the home; (2) "repeatedly withheld medical treatment or food from the child"; (3) "placed the child at substantial risk of harm" multiple times due to substance abuse and subsequently refused treatment; (4) "abandoned the child"—meaning "the parents of the child have failed to visit or maintain contact with the child for more than ninety days"; or (5) previously had parental rights terminated with respect to a sibling of the child. R.C. 2151.419(A)(2)(a)-(e) and 2151.011(C).

{¶ 20} Only the latter two Reunification Termination Factors are relevant in this case, but the immediate legal consequence of all of them is the same. Upon determining that one or more Reunification Termination Factors apply, the court must make a legal determination that an agency is no longer required to engage in Reunification Efforts and, with certain limited exceptions not applicable here, conduct a review hearing to approve a permanency plan for the child. R.C. 2151.419(A)(2), (C).

{¶ 21} In addition to the Reunification Termination Factors, if the "child has been in the temporary custody of one or more public children services agencies or private child

placing agencies for twelve or more months of a consecutive twenty-two-month period," the child meets the "12 of 22 Criteria," and an agency *must* file a motion for permanent custody. R.C. 2151.413(D)(1).[5] Under the 12 of 22 Criteria, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated [abused, neglected, or dependent] or the date that is sixty days after the removal of the child from home." R.C. 2151.413(D)(1). Ohio's General Assembly added the 12 of 22 Criteria to the permanent custody statute in 1999 to "limit the amount of time children spent in foster care, by providing an additional ground for granting permanent custody in which parents were given 12 months to work towards reunification with their child." *In re E.B.*, 2010-Ohio-1122, ¶ 19-20 (12th Dist.).

<u>Permanent Custody Consideration—Two-Part Test</u>

{¶ 22} Once a motion for permanent custody has been filed, the juvenile court may terminate parental rights and award permanent custody of a child to an agency only after engaging in a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.).

{¶ 23} First, the juvenile court must find that granting permanent custody to the Agency is in the "best interest" of the child. R.C. 2151.414(A)(1); *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). To determine a child's best interests, the court must consider:

> (a) "The interaction and interrelationship of the child" with the child's parents, foster caregivers, and others;
>
> (b) "The wishes of the child, as expressed directly by the child or through the child's guardian ad litem";
>
> (c) "The custodial history of the child," *with the existence of the 12 of 22 Criteria almost always weighing against the parent regaining custody*;

---

5. Similar criteria apply to children who have previously been in the temporary custody of an equivalent agency in another state. *Id*. This requirement applies unless the agency documents a compelling reason why permanent custody is not in the best interest of the child, or the agency has not provided the services required under its obligation to make Reunification Efforts, or the agency has already been granted permanent custody. R.C. 2151.413(D)(3).

(d) "The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;" and

(e) the existence of one or more of the "Reunification Termination Factors," *including child abandonment and prior termination of parental rights as to a sibling of the child*.

(f) any other factor the court deems relevant.

(collectively, the "Best Interest Factors"). *See* R.C. 2151.414(D)(1)(a)-(e) and 2151.414(E)(7)-(11); *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

{¶ 24} Second, before awarding an agency permanent custody, the juvenile court must find that at least one of the following "Legal Circumstances" applies: (1) the child is *abandoned*; (2) the child is orphaned, (3) the child meets the *12 of 22 Criteria*; (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions; and (5) none of the above circumstances apply, but the child cannot or should not "be placed with either of the child's parents within a reasonable time." R.C. 2151.414(B)(1)(a)-(e). *In re J.B.*, 2023-Ohio-2454, ¶ 13. Only one of the Legal Circumstances needs to be found under the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).[6]

Summary of the Cumulative Effects of Reunification Termination Factors and the 12 of 22 Criteria:

{¶ 25} All of the above demonstrates the immediate and cumulative effect the

---

6. Some permanent custody cases proceed under the fifth Legal Circumstance identified above and analyze whether a child can or should be placed with either parent within a reasonable time. R.C. 2151.414(B)(1)(a). This analysis involves assessing efforts taken by the Agency to assist a parent to "substantially remedy the conditions causing the child to be placed outside of the child's home" such as chronic drug use, a demonstrated "lack of commitment" to the child and otherwise failing to adequately provide for and bond with the child. *In re J.B.*, 2023-Ohio-2454, ¶ 20, citing R.C. 2151.414(B)(1)(a) and 2151.414(E). However, this is not one of those cases.

Reunification Termination Factors and the 12 of 22 Criteria can have in a permanent custody case. The presence of any of these circumstances may not only dictate the Agency's obligations (if any) to a parent before filing for permanent custody of a child but also will affect both parts of the permanent custody analysis.

{¶ 26} If any Reunification Termination Factors apply to a child (in this case, abandonment and prior termination of parental rights as to another child), the legal impact is significant:

(1) requiring the court to decide that the relevant agency is no longer required to engage in Reunification Efforts with the family, R.C. 2151.419(A)(2)(d), (e);

(2) requiring the court to hold a review hearing for a permanency plan, with certain limited exceptions, *id*. at (C);

(3) weighing against the parent in the consideration of the child's best interests, R.C. 2151.414(D)(1)(e), (E)(10), (11); and

(4) in the case of a child being legally "abandoned" by the parent, satisfying one of the statutorily defined Legal Circumstances, R.C. 2151.414(B)(1)(b).

{¶ 27} The legal impact of a child meeting the 12 of 22 Criteria is similarly substantial:

(1) requiring the agency to file a motion for permanent custody, with certain limited exceptions, R.C. 2151.413(D)(1), (3);

(2) weighing against the parent in the consideration of the child's best interests, R.C. 2151.414(D)(1)(c); and

(3) satisfying one of the statutorily defined Legal Circumstances, R.C. 2151.414(B)(1)(d).

{¶ 28} Again, a finding of one Legal Circumstance is all that is required to satisfy the second part of the court's permanent custody analysis. *In re C.S.*, 2020-Ohio-4414, at ¶ 16.

*Analysis*

<u>Reunification Efforts for Mother
and John Were Not Required</u>

{¶ 29} Mother's stated goal of reunification with John began at a disadvantage. Here, there is no dispute Mother's parental rights to Alice, John's sibling, were involuntarily terminated before John's proceedings. There is also no dispute that Mother had no contact with John for approximately five months after he was born and she moved to Rhode Island.[7] This exceeds the statutory threshold of 90 days necessary to find abandonment, so as a matter of law, Mother abandoned John. There is also no dispute that John meets the 12 of 22 Criteria.

{¶ 30} The implication of these facts for Mother was fourfold. First, the Agency had no duty to make reasonable efforts to reunify Mother and John. R.C. 2151.419(A)(2)(d), (e).[8]  Second, because none of the statutory exceptions applied, the Agency had to file a motion for permanent custody. 2151.413(D)(1), (3). Third, Mother's legal abandonment of John and the involuntary termination of her parental rights to John's sibling Alice weighed against Mother in the consideration of John's best interest— the first part of the court's analysis concerning permanent custody. R.C. 2151.414(D)(1)(e), (E)(10), (11). Finally, Mother's abandonment of John and the existence of the 12 of 22 Criteria are both Legal Circumstances capable of satisfying the second part of the court's permanent custody analysis. R.C. 2151.414(B)(1)(b), (d). With that backdrop in mind, we proceed to our review of the court's consideration of the two-

---

7. Mother's brief states she did not abandon John because she "remained dedicated to getting the child back . . . was actively pursuing case plan services [, and] . . . was seeking to have virtual contact with the child." However, none of this speaks to the statutory definition of abandonment. Mother's brief fails to refute in any manner that she failed to visit or maintain contact with John for more than 90 days.

8. We note that despite this, the Agency provided Mother with services including video and in-person supervised visits.

part permanent custody test.

Part One—The Best Interest Factors Analysis

{¶ 31} **Interaction and Interrelationships of John:** It is not contested that Mother actively used drugs during her pregnancy and that while John tested negative for drugs, he was admitted into the NICU with withdrawal symptoms. Mother had no contact with John after his birth and before leaving for Rhode Island. Mother began video visits with him in November of 2023 and in-person visits in late 2024 after moving back to Ohio. These in-person visits have been consistent and gone reasonably well, but Mother and Father have sometimes engaged in loud arguments during them. Despite these issues, the Agency does not contest that Mother and John have a bond.

{¶ 32} However, it is inescapable that Mother removed herself from Ohio for so long that John became integrated into the family of his foster parents. John calls his foster parents "mommy" and "daddy," and, as noted by the Agency, his foster parents have provided the only home he has ever known. John's foster family also previously fostered and adopted his elder sibling Alice, and they are willing to adopt John as well.

{¶ 33} This factor weighs in favor of granting the Agency custody.

{¶ 34} **Wishes of Child:** The magistrate did not interview John due to his age. However, the guardian ad litem recommended the Agency be granted permanent custody of John. *See* R.C. 2151.414(D)(1)(b).

{¶ 35} This factor favors the Agency.

{¶ 36} **Custodial History of Child:** The court granted temporary custody of John to the Agency on June 23, 2023, and determined him to be a dependent child on August 11, 2023. John has been in the Agency's custody (via his foster parents) for all but his entire life (fulfilling the 12 of 22 Criteria).

{¶ 37} This factor favors the Agency.

{¶ 38} **Need for Legally Secure Placement:** It is undeniable that Mother made great progress in addressing her substance abuse as well as other issues that prevented her from effectively parenting John from birth. That progress should be commended. However, at the time of the permanent custody hearing, Mother lived in a rented room of a home along with her fifth child (and at one point Father). Mother admitted such housing provided no room for John. In addition, while Aunt passed a home study, no motion was ever made for her to be considered as a potential placement for John.

{¶ 39} Ultimately, despite Mother's laudable progress, this factor still favors the Agency.

{¶ 40} **Parental Placement Factors:** As previously stated, the fact that Mother previously lost legal custody to Alice and she legally abandoned John are significant factors that also weigh in favor of granting permanent custody to the Agency.

{¶ 41} All relevant factors analyzed by the juvenile court in its Best Interest Factors analysis favored the Agency.

Part Two—Legal Circumstances Analysis

{¶ 42} Again, Mother does not contest that John had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period at the time of the permanent custody hearing. In addition, as previously established, Mother legally abandoned John. These two circumstances are each individually capable of satisfying the second prong of the permanent custody analysis.

{¶ 43} Upon review, we conclude the juvenile court's determination that (1) it was in John's best interest to award permanent custody to the Agency; and (2) at least one of the required Legal Circumstances was satisfied was not against the manifest weight of the evidence.

Mother's Policy Based Arguments

{¶ 44} Despite the foregoing, Mother asserts "[t]he problem in this case is that the [A]gency and even the foster family went into it assuming that [because] [M]other had lost custody of another child, this one would be taken by permanent custody as well." Ultimately, Mother equates granting permanent custody to the Agency as "look[ing] past" the strides she has taken to improve herself and her situation.

{¶ 45} It is important to remember in permanent custody proceedings that "a parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is simply a means to a goal, but not the goal itself." *In re A.R.,* 2016-Ohio-4919, ¶ 18 (12th Dist.). As previously discussed, her rights "'are not absolute, [and] are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham,* 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974). *See also In re B.C.*, 2014-Ohio-4558, ¶ 20, quoting *In re Cunningham*.

{¶ 46} Mother's argument asks us to ignore the emphasis placed by the legislature on the profound impact that her prolonged abandonment of John had on *his* (not her) best interest, and advocates for a general policy that when a parent remedies the situation that led to the removal of a child, permanent custody should *never* be granted to the Agency, regardless of other circumstances. This court does not have the constitutional or statutory authority to decide what "should" be the policy in Ohio for determining whether permanent custody should be awarded to the Agency. Instead, that authority lies solely with the legislature elected by the people of this State. That legislature has clearly rejected Mother's policy argument.

{¶ 47} This assignment of error is overruled.

**Second Assignment of Error: Ineffective Assistance of Counsel**

*Applicable Law and Standard of Review:*

{¶ 48} "[P]arental rights involve a fundamental liberty interest, procedural due process, which includes the right to effective assistance of counsel." *In re M.G.*, 2023-Ohio-1316, ¶ 53 (12th Dist.), citing *In re C.D.*, 2009-Ohio-6922, ¶ 22 (12th Dist.). As a result, "[a] parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re L.J.*, 2015-Ohio-1567, ¶ 33 (12th Dist.).

{¶ 49} The efficacy of counsel is judged by the same standard in criminal and custody proceedings. *See M.G.* at ¶ 53. The conduct of counsel is presumed to be effective, but ineffective assistance of counsel can be established if a defendant shows (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-692 (1984). Courts determine deficient performance by asking whether counsel's conduct "fell below an objective standard of reasonableness" based on "the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 688, 690. In turn, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A defendant's failure to sufficiently show either *Strickland* prong is fatal to a claim of ineffective assistance. *State v. Lloyd*, 2022-Ohio-4259, ¶ 31, citing *Strickland* at 697.

*Analysis*

{¶ 50} Mother argues on appeal her trial counsel was deficient for failing to file a motion to grant Aunt legal custody. Mother points out Aunt passed a home inspection, visited with John during the case, and appeared to testify at the hearing. Mother therefore reasons her counsel had no reason to not file a motion.

{¶ 51} Mother's argument assumes Aunt did in fact want permanent custody of John. However, at the hearing, the relative testified that she wanted John to be reunited with Mother and Father and was rebuffed by them at least once when she suggested she could be a placement for John. Moreover, nothing prevented Aunt from retaining her own counsel, becoming a party to this case, and filing her own motion to be considered as a placement for John. *See* R.C. 2151.414 (D)(2)(d) (requiring trial court to consider whether a "relative or other interested person has filed, or has been identified in, a motion for legal custody of the child"); *In re Grooms*, 2004-Ohio-6782, ¶ 22 (2nd Dist.) (grandmother who had a limited relationship with grandchildren involved in permanent custody proceedings "never filed a motion with the court" despite asking the social worker "for paperwork to be considered for placement"). Aunt ultimately did none of these things.

{¶ 52} Even if we were to consider the conduct of Mother's trial counsel deficient (which we do not), Mother admits that "[h]ow the court would have ruled on that can only be a matter of conjecture." Despite this, she asserts that "[p]rejudice lies in the fact the court could not even consider" the relative for a permanent placement. Not so. Mother must *demonstrate* prejudice by showing "there is a reasonable probability" that if her trial counsel had filed a motion for placement with the relative, the trial court would have granted that motion. Her borderline perfunctory arguments do not come close to meeting that standard.

{¶ 53} This assignment of error is overruled.

## Conclusion

{¶ 54} Mother started this case at a disadvantage because her parental rights of Alice were previously terminated. This disadvantage was compounded when Mother left Ohio. Regardless of her intention in doing so, Mother abandoned John. This voluntary

absence affected her ability to form a meaningful parental bond with John. All the while, John formed a bond with his foster family. Mother's improvement is notable and commendable, but contrary to Mother's testimony at trial, the Agency did not fail her and John (after her legal abandonment, it had no obligation to seek their reunification in the first place). Ultimately, as John's guardian ad litem stated, Mother efforts were "too little, too late" when the stakes were clear.

{¶ 55} Judgment affirmed.

HENDRICKSON , P.J., and M. POWELL, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge